# EXHIBIT 10

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

SABRINA E. MORRISSEY, acting in her capacity as
Guardian of W.W.H.,

    *Plaintiff,*

   -against-

A&E TELEVISION NETWORKS, LLC; ENTERTAINMENT
ONE REALITY PRODUCTIONS, LLC; LIFETIME
ENTERTAINMENT SERVICES, LLC; CREATURE FILMS,
INC.; and MARK FORD,

    *Defendants.*

---

Index No. 650893/2024

**VERIFIED AMENDED
COMPLAINT**

Sabrina E. Morrissey, Esq., acting in her capacity as Guardian of W.W.H. (the "**Guardian**"), files this Verified Amended Complaint against Defendants A&E Television Networks, LLC ("**A&E**"), Entertainment One Reality Productions, LLC ("**EOne**") Lifetime Entertainment Services, LLC ("**Lifetime**"), Creature Films, Inc. ("**Creature Films**"), and Mark Ford (collectively, "**Defendants**"). Upon personal knowledge as to her own conduct and upon information and belief with respect to the conduct of others, the Guardian alleges the following:

  1.  This case arises from the brutally calculated, deliberate actions of powerful and cravenly opportunistic media companies working together with a producer to knowingly exploit W.W.H., an acclaimed African-American entertainer who, tragically, suffers from dementia and, as a result, has become cognitively impaired, permanently disabled, and legally incapacitated ▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉

1

Case 1:24-cv-07856-RA    Document 1-10    Filed 10/16/24    Page 3 of 76

███████████████████████████████████████████████

██████████████████████████████████████

2.      Eager to sensationalize and profit from W.W.H.'s cognitive and physical decline, Defendants took advantage of W.W.H in the cruelest, most obscene way possible for their own financial gain, in a manner that truly shocks the conscience. Defendants created and published a stomach-turning four-part "documentary" entitled, *Where is Wendy Williams?"* (the "**Program**"), which was filmed without a valid contract, and released without the Guardian's consent. As is patently obvious from the very first few minutes of the Program itself, W.W.H. was highly vulnerable and clearly incapable of consenting to being filmed, much less humiliated and exploited. When the Guardian discovered that Defendants' true intentions were to portray W.W.H. in a highly demeaning and embarrassing manner, she immediately sought to protect W.W.H. and to preserve her dignity. But Defendants fought to move ahead and released the Program over the weekend of February 24 and 25, 2024. Not surprisingly, the public reacted with disgust and revulsion at Defendants' blatant and vicious exploitation of W.W.H. By willfully taking advantage of a severely impaired, incapacitated person, Defendants have made millions on W.W.H.'s back, while W.W.H. has received a paltry $82,000.

## A. W.W.H. Tragic and Widely Publicized Cognitive and Physical Decline

3.      Hailed as *"a genuine trailblazer in multiple media formats,"*[1] W.W.H. is a prominent and accomplished broadcaster who has earned her icon status through her highly successful, 30-year multimedia career. From 2008 through mid-2021, W.W.H. solo-hosted and executive-produced one of the most-watched daily television talk shows in the United States,

---

[1] Shamira Ibrahim, *The Misrepresentations of Wendy Williams' Undeniable Legacy*, Vice (Aug. 18, 2022), https://www.vice.com/en/article/pkga98/what-happened-to-wendy-williams-conservatorship-financial-guardianship.

leveraging her intellectual prowess and fearlessness as an interviewer, as well as her prodigious people skills and authenticity to build a large and loyal fan base. W.W.H. was known for her glamorous appearance, including her trademark wigs, her encyclopedic knowledge of celebrity culture, and her strong connection with her audience and her loyal fans. W.W.H. famously hosted her daily talk show for many years with extemporaneous repartee, relying on her extraordinary intelligence and ability to communicate in a highly engaging and entertaining manner. During her long career in the spotlight, while it is hardly surprising that W.W.H.'s statements were sometimes controversial, no one can deny her remarkable contributions to media and to popular culture. Indeed, she popularized a number of well-known phrases over the years that remain a part of popular culture today, including her famous greeting: "How you doin'?"

4.      In or around January 2019, in the wake of the devastating, public news that her then-husband and business partner had fathered a child with another woman, W.W.H. took a six-week leave from her television show and reportedly went to seek care at a rehabilitation facility in Florida. During that stay, her son and then-husband were reportedly told by treating healthcare professionals that W.W.H. was suffering from brain damage.[2]

5.      Sadly, W.W.H.'s cognitive functioning and physical condition only continued to decline. As the host of a popular daily talk show at the time, W.W.H.'s difficulties were often captured on camera.

---

[2] Molly Claire Goddard, *Wendy Williams Has 'Holes in Her Brain' From 'Alcohol-Related' Damage*, OK Magazine (Feb. 23, 2024), https://okmagazine.com/p/wendy-williams-holes-in-brain-from-alcohol-related-damage/.

3

Case 1:24-cv-07856-RA    Document 1-10    Filed 10/16/24    Page 5 of 76

6. Rumors swirled in the press regarding W.W.H.'s increasingly erratic behavior. As early as 2021, press reports attributed these changes to early-onset dementia.[3] These reports were widely circulated on social media, in the press, and on entertainment talk shows.[4]

7. By fall 2021, W.W.H. was no longer able to appear on her long-running talk show due to her cognitive impairment and continuing decline, which had become severe and readily apparent to anyone who spent any time with her. Over the following months, a series of guest hosts filled in for W.W.H. In February 2022, W.W.H.'s long-running talk show was permanently cancelled after it became clear that she would be unable to return.[5]

8. By late 2021, W.W.H. was so cognitively impaired, and had lost so much executive capability, that she was no longer capable of managing her own personal and business affairs.

9. She spent several months with her family in Florida toward the end of 2021 and into early 2022.

10. In May 2023, W.W.H. was diagnosed by doctors at Weill Cornell Medical Center with frontotemporal lobe dementia ("**FTD**") and primary progressive aphasia ("**PPA**")—cruel, debilitating, and progressive neurogenerative diseases that result in significant and readily

---

[3] iHeart, *Wendy Williams Reportedly Restricted to a Wheelchair* (Nov. 23, 2021), https://www.iheart.com/content/2021-11-23-wendy-williams-reportedly-restricted-to-a-wheelchair/.

[4] *See, e.g.*, *supra* note 2; Hot 97, *Wendy Williams Is Allegedly Confined To A Wheelchair And Showing Early Signs Of Dementia*, https://www.hot97.com/news/wendy-williams-is-allegedly-confined-to-a-wheelchair-and-showing-early-signs-of-dementia/; Keenan Higgins, *Wendy Williams Allegedly Is Confined To A Wheelchair & Is Showing Early Signs Of Dementia* (Nov. 22, 2021), https://rickeysmileymorningshow.com/2706098/wendy-williams-allegedly-confined-wheelchair-showing-signs-dementia/; Simon Delott, *Wendy Williams Unable to Walk, In Early Stages of Dementia* (Nov. 23, 2021), https://www.thehollywoodgossip.com/videos/wendy-williams-unable-walk-in-early-stages-of-dementia-report/.

[5] *See* Lacey Rose, *Inside the Final Days of 'The Wendy Williams Show'*, Hollywood Reporter (Aug. 17, 2022), https://www.hollywoodreporter.com/feature/the-wendy-williams-show-inside-final-days-1235199635/.

4

apparent behavioral changes and gradually rob their victims of the ability to communicate at all. FTD often significantly shortens life expectancy, and W.W.H. is only 60 years old.

**B. The W.W.H. Guardianship Proceeding**

11.     By January 2022, Wells Fargo employees had documented a pattern of unusual and disturbing events concerning W.W.H.'s welfare and finances which led them to fear that she had already been taken advantage of and would be the subject of financial abuse in the future.  As a result of these troubling incidents, Wells Fargo contacted ███████████████████████ ████████████████.  Wells Fargo also reported ██████████████████████ ███████, and thereafter took the extraordinary and highly unusual step of initiating a guardianship proceeding on its own in the Supreme Court of New York, New York County, ████ ████████████████████ (the "**Guardianship Proceeding**"), pursuant to Article 81 of the New York Mental Hygiene Law, asking the court to appoint an independent guardian for W.W.H.'s financial affairs.  Given concerns about the release of protected medical and financial information, the Court sealed the proceeding.

12.     ████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ █████████████████████.

13.     ████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████

14. ███████████████████████████████████████

███████████████████████████████████████

14. ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████.

15. ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████.

16. ███████████████████████████████████████

███████████████████████████████████████

███████████████████████ Nonetheless, the existence of the Guardianship Proceeding was

leaked to the media, and as early as May 2022, it was a widely-publicized fact that the court had

established a guardianship for W.W.H.[6]

---

[6] The Court's wisdom in acting to shield these proceedings from full public access was further
confirmed and underscored by what transpired when the identity of W.W.H.'s financial advisor
was revealed:  the financial advisor was subsequently subjected to extreme online abuse and
bullying and even death threats by individuals purporting to be W.W.H.'s fans.  Her family was
threatened.  The situation became so bad that Wells Fargo ultimately had to hire personal security
for their protection.

6

### C. Will Selby, The Wendy Experience, Inc., and the August 2022 Development Shoot

17.    Up until her FTD and PPA diagnoses, W.W.H. continued to live in her Manhattan apartment, to provide her with as much normalcy and autonomy as possible under the circumstances, as required by Article 81. W.W.H. saw different medical specialists in New York, for treatment of various ailments. She had home health caregivers, who assisted with her personal needs. Her behavior was, at times, erratic. As one example, W.W.H. would regularly discard items in the apartment, including her personal property and food items. At times, she would instruct the caregivers to leave, insisting that she was capable of looking after herself in her own home.

18.    After the Guardian was appointed, Will Selby, a jeweler and social media personality, began to hold himself out as W.W.H.'s new manager. Mr. Selby sought to feature W.W.H. on a podcast, and he created a promotional website to advertise the podcast and sell related merchandise.

19.    In or around the summer of 2022, Defendants EOne, Creature Films, and Mark Ford began to produce a reality television show about W.W.H. to air on the Lifetime Network, a cable channel that is part of Defendant Lifetime, which is owned by Defendant A&E. In response to concerns expressed by the Guardian, Mr. Selby told the Guardian that the program would focus on W.W.H.'s triumphant return to media as she embarked on her new podcast venture, that the producers would not exploit W.W.H., that they would portray W.W.H. in a positive light, and that Mr. Selby would have full creative control over the program. When the Guardian asked Mr. Selby what he meant by "full creative control," he said, "If I do not want it in the film, they will take it out."

20.    During filming, similar representations were made to W.W.H.'s court-appointed attorney by Defendant EOne's attorneys. Each and every one of these representations was false

and intended to induce W.W.H.'s participation in the show and assuage the Guardian's justifiable concerns.

21.     Beginning in or about August 2022, over a period of a few days, Mr. Selby facilitated Defendants' access to W.W.H., mostly at her private residence in order for Defendants to film her.

22.     Around the same time, on August 17, 2022, *The Hollywood Reporter* published an article saying that insiders from W.W.H.'s long-running talk show had witnessed disturbing incidents during filming in 2021 during which W.W.H. was incoherent and production had to be abruptly cut off after mere minutes.[7]   The article also indicated that medical professionals were trying to determine what was causing "symptoms like nonlinear speech, brain fog, memory loss and even hallucinations," and that sources close to W.W.H. were confident that substance abuse was not solely to blame, and that there were clearly "other health issues at play."[8]  Defendant Ford and his crew were undoubtedly aware of these reports, but insisted on entering W.W.H.'s residence and filming her anyway.

23.     As discussed further below, W.W.H.'s severe and incapacitating cognitive and physical impairments were immediately apparent to Defendant Ford and his crew when they began filming in August 2022.

24.     Indeed, within a month of commencing filming, W.W.H. was treated at a residential wellness facility to attempt to stabilize her and address her erratic behavior.  She spent two months in treatment.

---

[7] Lacey Rose, *Inside the Final Days of 'The Wendy Williams Show'*, Hollywood Reporter (Aug. 17, 2022), https://www.hollywoodreporter.com/feature/the-wendy-williams-show-inside-final-days-1235199635/.

[8] *Id.*

INDEX NO. 650893/2024
RECEIVED NYSCEF: 10/03/2024

### D. The Contract Between The Wendy Experience, Inc. and EOne

25.     Not before, but after filming began, Defendant EOne, with the assistance and input of Defendants Ford, Creature Films, and A&E, eventually drafted a one-sided "on-camera talent agreement" (the "**Contract**") in an attempt to legitimize their unsavory and exploitative project.

26.     This agreement was submitted after W.W.H. had already been filmed by Defendants while she was clearly disheveled, not mentally present, and confused. No person who witnessed W.W.H. in these circumstances could possibly have believed that she was capable of consenting either to an agreement to film, or to the filming itself.

27.     The Contract with EOne was executed on January 25, 2023, by The Wendy Experience, Inc., an entity controlled by Mr. Selby. The Contract also bears a printed, not cursive signature purporting to be the signature of W.W.H., but looks nothing like W.W.H.'s signature, which is visually distinct:





*Signature on the Contract*                         *W.W.H.'s signature*

28.     Apart from the signature, which does not appear to be genuine, there is no evidence that W.W.H. signed the Contract. In all events, W.W.H. was incapacitated and unable to consent at the time the Contract or its amendments were executed, even if she had signed it (which she did not).

29.     Pursuant to the Contract, The Wendy Experience, Inc. agreed to "lend" W.W.H.'s services to EOne for the filming of a reality television show starring W.W.H. The Contract further provides that W.W.H. will be credited as an "executive producer" for the Program (a fact that

9

Case 1:24-cv-07856-RA     Document 1-10     Filed 10/16/24     Page 11 of 76

Defendants have relied on, implying that W.W.H. endorsed the Program). Although Defendants were well aware a guardian had been appointed for W.W.H., *the Guardian was not involved in the creation of the Program or the Contract and was not shown a copy of the Contract until months after it was purportedly executed.*

30.     Indeed, none of the Defendants ever gained the Guardian's consent for W.W.H.'s participation in the film, and there was no way W.W.H. could have consented, as she was incapacitated prior to and during filming.  Pursuant to the orders issued by the Court in the Guardianship Proceedings, the Guardian was not permitted to discuss W.W.H. with Defendants. The Guardian explained this to Mr. Selby.  The Guardian also told Mr. Selby that she, and perhaps even the Justice in the Guardianship Proceeding, would need to see and approve the final product before it could air.

### E. The Guardian's Discovery of the Contract and EOne's False Representations Regarding the Program

31.     On March 14, 2023, after the Guardian learned of the Contract, a court-appointed attorney representing W.W.H. spoke with counsel for EOne for the first time and explained that W.W.H. was not in a position to consent to the Contract and that it would need to be amended before it could be approved by the Guardian.  On two phone calls on March 14 and March 15, 2023, EOne's in-house attorneys, Jada Jones and Blossom Lefcourt, assured W.W.H.'s court-appointed attorney that no footage of W.W.H. would be used or released unless and until an agreement could be reached and approved by the Guardian, and that the final product would portray W.W.H.'s "comeback" and show her in a positive light.

32.     The Guardian did not try to stop the filming because she was actively misled about Defendants' activities and treatment of W.W.H. and was unaware of the damaging way that Mr. Ford, his crew, and the remaining Defendants were filming W.W.H.  She believed with Mr. Selby's

10

Case 1:24-cv-07856-RA    Document 1-10    Filed 10/16/24    Page 12 of 76

oversight, W.W.H. was being treated properly and with respect and dignity. She was even texted pictures during filming that showed W.W.H. on set, professionally made up, well-dressed, and looking beautiful and happy. These pictures include the following:







33.     The Guardian was reassured by the images she saw, by Mr. Selby's representations that the project would be a positive experience for W.W.H. and that it would help to introduce her podcast, should one be created later, and by Defendants' March 14 and March 15, 2023 representations to W.W.H.'s court-appointed attorney.

34.     No one viewing these photographs could have possibly imagined what Mr. Ford and his crew were really planning or what the finished product would depict.  Had the Guardian known that Mr. Ford and his crew were taunting, goading, and tormenting W.W.H., she would have sought to stop filming immediately.

35.     The Guardian was told by Mr. Shelby that the film crew wanted to film W.W.H. meeting with her elderly father in Florida.  No discussion took place about filming W.W.H. with other family members or in any other context.  The Guardian consented to W.W.H. visiting her father in Florida.

36.     Similarly, no discussion ever took place between the Guardian and Mr. Selby about W.W.H.'s other family members being filmed as part of the project, either in New York or in Florida.

37. No consent was ever given by the Guardian for W.W.H. to travel to California for filming.

**F. The Release of the Trailer**

38. In May 2023, immediately after W.W.H. was diagnosed with FTD and PPA, she began to receive 24/7 care in a protected environment. Afterward, Defendants repeatedly sought access to W.W.H. to film additional footage. For W.W.H.'s protection, the Guardian refused to allow any further filming of W.W.H. The Guardian also declined all requests to be interviewed by media sources, as she is still under a court order to refrain from discussing W.W.H. outside of the context of the Guardianship Proceeding.

39. As the months passed in 2023 and into early 2024, the Guardian reasonably assumed that the project was defunct, given that no contract was ever finalized and that W.W.H was obviously not working on a podcast or focusing on her career at that time. Then, on February 2, 2024, without any notice whatsoever to the Guardian, A&E released a salacious promotional trailer for the Program and announced that it would air on Lifetime Networks in two segments on February 24 and 25, 2024 (the "**Trailer**").

40. The Trailer presents W.W.H.'s tragic decline as an entertainment spectacle. Opening with scenes from the height of W.W.H.'s career, the Trailer invites viewers to contrast these clips with more recent footage obtained by Defendants, in which W.W.H. is shown disheveled and disoriented, and often appears half dressed. Her emotional state fluctuates wildly, and she repeatedly yells—even shouting, when in New York City, "I have no idea where we are!"

41. The obvious purpose of the Trailer is to invite the audience to gawk at W.W.H.'s cognitive and physical decline, which Trailer suggests is attributable to alcohol abuse. The Trailer depicts W.W.H. in an extraordinarily degrading and humiliating manner. As a February 2, 2024 *Los Angeles Times* article states: "*[W.W.H.] is shown inebriated, struggling to stand, tearful and*

13

*seemingly suffering memory loss – all while insisting to friends and family she is of sound mind.*"[9]

42.    The release of the Trailer and related footage caused a firestorm of negative publicity and attention for W.W.H.  Although prior to its release, Defendants had been informed by W.W.H.'s family members that W.W.H. was diagnosed with dementia, *no* mention of W.W.H.'s cognitive condition was made in the Trailer or in other marketing materials.  Instead, Defendants' marketing of the Program explicitly portrayed W.W.H. as a laughingstock and drunkard, implicitly responsible for her own continued suffering.  Unflattering pictures and footage of W.W.H., including photographs of her in a wheelchair with her legs spread, were dredged up and widely published across all forms of media, inviting the public to gawk and jeer at W.W.H.'s fall from grace and her physically debilitated condition.  W.W.H. was even displayed in the Trailer (and in subsequent Program episodes) without her famous wig, her head nearly bald.  The Guardian was stunned and appalled by this, as W.W.H., insists on wearing her wig for all meetings, and she would never, ever have consented and allowed herself to be filmed for the public without her wig for public consumption.

43.    Despite the disturbing nature of the Trailer, in which W.W.H. appears obviously cognitively impaired and confused, Defendants falsely insisted to the press that W.W.H. had "executive produced" the Program, and suggested, among other inaccurate things, her approval of the final product.  This was a blatant lie:  W.W.H. never even saw either the Trailer or the Program before they aired, much less endorsed them.

---

[9] Malia Mendez, *Wendy Williams Resurfaces in Trailer for Her Lifetime Documentary Debuting this Month*, L.A. Times (Feb. 2, 2024), https://www.latimes.com/entertainment-arts/tv/story/2024-02-02/wendy-williams-resurfaces-lifetime-documentary-debuting-this-month.

14

44.     The Guardian was completely shocked and horrified by the Trailer, which flew in the face of Defendants' assurances that W.W.H. would be treated with dignity and respect and would be depicted in a positive light.  On February 22, 2024, the Guardian sought and obtained an *ex parte* temporary restraining order ("**TRO**") from the Commercial Division of the New York State Supreme Court, New York County, temporarily restraining Defendants A&E and EOne from releasing the Program.  In the papers supporting the application for the TRO, the Guardian affirmed under oath that W.W.H. had lacked capacity to consent to the Contract, that W.W.H. was diagnosed with FTD and PPA in May 2023, and that the Guardian had never approved the Contract.  The Guardian also obtained a court order temporarily sealing the action, in light of the court orders that sealed the Guardianship Proceeding to safeguard W.W.H.'s financial and health information.  Within hours of Defendants' being served, copies of the TRO motion papers were leaked to multiple press outlets, in blatant violation of the Court's orders.[10]

45.     That same day, W.W.H.'s care team issued a press release publicly announcing W.W.H.'s formal diagnoses of FTD and PPA.

46.     Defendants A&E and EOne then moved the Appellate Division, First Department for an order vacating the TRO on First Amendment grounds.  On February 23, 2024, the Appellate Division vacated the TRO as an impermissible prior restraint on speech, allowing the Program to be aired without being reviewed first by the Guardian or the Justice in the Guardianship Proceeding.  The ruling did not address the merits of the Guardian's assertion that W.W.H. lacked capacity to consent to the Contract.

---

[10]  *See, e.g.*, *Wendy Williams Guardian Files Sealed Lawsuit*, TMZ (Feb. 22, 2024), https://www.tmz.com/2024/02/22/wendy-williams-temporary-guardian-files-lawsuit-lifetime-documentary/.

15

### G. The Release of the Program

47.    Undeterred by the public revelation of W.W.H.'s diagnoses and by the Guardian's affirmation that W.W.H. had lacked capacity to consent to the Contract, not to mention their own knowledge of W.W.H.'s diagnosis of dementia, Defendants shamelessly doubled down on their scheme to profit from the footage they had wrongfully captured.  They did so despite their full awareness that the Program depicted a severely disabled woman who was not in control of her behavior and who had lost the ability to make conscious and informed decisions throughout the filming.   In a recent interview, Lifetime Executive Brie Miranda Bryant inexplicably claimed Defendants were unaware of W.W.H.'s dementia diagnosis when they began the project, but in the same interview, she admitted that Defendants had learned of it in the "first two hours."[11]  But they proceeded to film W.W.H. and then air the Program, anyway.

48.    On February 24 and 25, 2024, Defendants released the Program on Lifetime and related streaming platforms.  Far from depicting W.W.H. positively, as promised, the Program is replete with images of her in bed, flat on her back, and in confused or highly agitated states, behaving erratically, and at times unaware of where she is.[12]

49.    The following images from the Program are a far cry from those sent to the Guardian during filming:

---

[11] Emily Trainham, *Wendy Williams Documentary Producers Wouldn't Have Filmed Her if They'd Known She Had Dementia*, Fox News (Feb. 27, 2024), https://www.foxnews.com/entertainment/wendy-williams-documentary-producers-wouldnt-have-filmed-if-theyd-known-dementia.

[12] The entire four-plus hour Program is replete with disturbing scenes and images.  Several news organizations have prepared publicly available compilations or summaries , which provide a small sample of these scenes.  *See, e.g.*, Access Hollywood, *Wendy Williams Docuseries Bombshells: Alcoholism, Medical Issues & More*, YouTube (Feb. 26, 2024), https://www.youtube.com/watch?v=KXt7SRrkWgg.

16





Case 1:24-cv-07856-RA    Document 1-10    Filed 10/16/24    Page 19 of 76





50.     In an utterly depraved moment, Defendants A&E and Lifetime shamelessly attempted to promote this fiasco as ***part of Lifetime's celebration of Black History Month***, airing

18

an earlier documentary and television movie featuring W.W.H. in the leadup to the Program's release with the banner "Join *Lifetime* in Celebrating Black History Month Every Day.":



51.     It should have been abundantly clear to anyone present during filming, and later throughout the production of the Program, that W.W.H. did not have capacity to consent to being filmed or to otherwise participate in the Program.  It is patently clear that Defendants' choices to continue and then release and profit from the project were exploitative and unethical in a way that truly shocks the conscience.

52.     Unsurprisingly, the Program was met with a tsunami of approbation and criticism. As *Variety* wrote in its review, this "is not a series about the next chapter of [W.W.H.'s] life but instead ***an exploitative display of her cognitive decline and emotional well-being***."[13]  Numerous other media outlets agreed:

- *The Daily Mail* – "***It all feels gross***.  As anyone who loves someone with dementia knows, their personal dignity is the first thing to go.  To have that stripped so very

---

[13] Aramide Tinubu, *'Where is Wendy Williams?' Docuseries Is Unsettling and Exploitative: TV Review*, Variety (Feb. 24, 2024), https://variety.com/2024/tv/reviews/where-is-wendy-williams-review-lifetime-1235920928/.

publicly — *when it seems [W.W.H.] doesn't have the cognition to assent* — is *particularly gruesome*."[14]

- *Collider* – "It's beyond disappointing that not one person on the Lifetime network's production or distribution team realized the disservice being done to [W.W.H.], her family, her fans and, quite frankly, to television history, by pushing the green light on Saturday, February 24th."[15]

- *Black Entertainment Television* – "If hell is real, I have some nominees who belong in one or more of its seventh circles. *It only took me one minute of watching Lifetime's* Where Is Wendy Williams? *to know it didn't belong on television*."[16]

- *The Guardian* – [I]n capturing [W.W.H.] like this, *Where is Wendy Williams?* is doing the very thing it purports to be exposing – exploiting a declining star and turning her pain into profit."[17]

- *The Cut* – "What good is it to bear witness to [W.W.H.] in bed with half-polished-off bottles of vodka surrounded by members of her management team, to her struggling to recognize a photo of herself, to her berating her staff over buying the

---

[14] Maureen Callahan, *TV's Ghoulish New Low: Dementia-Hit Wendy Williams is Reduced to a Sideshow Freak as Relatives Crawl into her Fading Spotlight*, Daily Mail (Feb. 23, 2024), https://www.dailymail.co.uk/tvshowbiz/article-13116139/Wendy-Williams-dementia-documentary.html (emphasis added).

[15] Christal Jordan, *The Wendy Williams Docuseries Is an Invasion of Health Privacy*, Collider (Feb. 26, 2024), https://collider.com/where-is-wendy-williams-docuseries/.

[16] Michael Arceneaux, *Lifetime's* 'Where is Wendy Williams' *Documentary Should Raise Concerns Over Ethics and Accountability*, Black Entertainment Television (Feb. 29, 2024), https://www.bet.com/article/zsovam/opinion-lifetimes-where-is-wendy-williams-should-raise-concerns-over-ethics-and-accountability (emphasis added).

[17] Tayo Bero, *Is the Wendy Williams Docuseries Saving a Vulnerable Person, or Exploiting Her?*, The Guardian (Mar. 1, 2024), https://www.theguardian.com/commentisfree/2024/mar/01/wendy-williams-docuseries-exploitation.

20

Case 1:24-cv-07856-RA    Document 1-10    Filed 10/16/24    Page 22 of 76

wrong vape pens? . . . [It makes] a mockery of [W.W.H.], underscoring the long-standing suspicion that we're willing to feed on anyone's tragedy as long as it's entertaining enough.[18]

53.     Facing a firestorm of criticism in the press and on social media, Defendants began releasing a panicked series of *post hoc* contradictory and often nonsensical statements attempting to justify their blatant disregard and abuse of an obviously incapacitated person.  They even attempted to shift the blame for their own actions to the Guardian, who did everything in her power to prevent the Program from being released.

54.     For example, Mr. Ford made some bizarre *post hoc* assertions that the Program was intended to capture the reality of W.W.H.'s life while living with dementia.[19]   These claims are plainly contradicted by the Program itself, which repeatedly emphasizes the theme that W.W.H. was drunk, not demented.

55.     Despite Mr. Ford's claims, there is no disclaimer informing viewers that W.W.H. is suffering from FTD and PPA (facts that unfortunately had to be made public after the Trailer aired); instead, the focus of the Program is alcohol use, and W.W.H. is repeatedly questioned about her alcohol consumption.  Dementia is not discussed until halfway through the final episode, as an afterthought, when it is mentioned briefly by family members.  No medical experts are interviewed to give appropriate context regarding W.W.H.'s seemingly erratic behavior, and there are no attempts to explore what dementia means or how it affects W.W.H.  The Program devotes far more

---

[18]  Brooke Marine, *What Do We Owe Wendy Williams?*, The Cut (Mar. 1, 2024), https://www.thecut.com/article/wendy-williams-documentary-reaction-review.html.

[19] Lacey Rose, *Wendy Williams Doc Producers: "If We'd Known She Had Dementia, No One Would've Rolled a Camera*, Hollywood Reporter (Feb. 26, 2024), https://www.hollywoodreporter.com/tv/tv-features/where-is-wendy-williams-documentary-dementia-diagnosis-producers-interview-1235836418/.

21

Case 1:24-cv-07856-RA    Document 1-10    Filed 10/16/24    Page 23 of 76

time to a staged outing for W.W.H. to buy vape pens and a strange trip to California, ostensibly to meet with studio executives, than it does to the topic of dementia.  Other examples abound:

- Defendant Ford said that an Emmy nomination "would be an amazing tribute to [W.W.H.] . . . for something she was an executive producer on," citing her phony executive producer credit to suggest that she had approved the Program.[20]  But in reality, W.W.H. did not see the Program before it was released, had no control over its content, and did not have the capacity to consent to being filmed.

- Defendant Ford, without a hint of irony, told the press that "if we had known that [W.W.H.] had dementia going into it, no one would've rolled a camera."  Yet rumors of W.W.H.'s dementia had been public knowledge for several years by the time that filming began, and the fact that W.W.H is subject to guardianship had become public knowledge and received widespread media coverage by the time Defendants began filming in August 2022.   And there can be no legitimate question that Defendants knew of W.W.H.'s FTD and PPA when they released the Program.  Despite this awareness, Defendants remained steadfast in their commitment to release and profit off her degradation as shown on the Program anyway.

- Defendant Ford said that although W.W.H. had "moments of clarity" during filming, "there were times when she was completely a different person."  But

---

[20] Zach Seemayer, 'Where Is Wendy Williams?' *Producers Say Wendy's Story Is 'Not Over'*, ET Online (May 2, 2024), https://www.aol.com/entertainment/where-wendy-williams-producers-wendys-061100472.html.

Defendants created a Program that featured no such "moments of clarity," and
instead honed in on her most humiliating behavior.

56.     In trying to shift blame to the Guardian, Defendant Ford lied to the press: "[I]t was
all signed off on. [The Guardian] was communicating with Will Selby . . . . Will was the point of
contact with the guardian throughout the process and he would have to go to her to get documents
signed, to get location agreements, to book her travel out of state. All of these were things that
had to be signed off on by the guardian throughout."[21] In reality, Mr. Ford knew that the Guardian
had never approved the Contract, and that the producers had facilitated out-of-state filming in
California without the approval of the Guardian. In fact, the Guardian did not learn that W.W.H
was in California being filmed until she was already there; indeed, a "plot point" of the Program
is that no one caring for W.W.H. knew she had been taken—kidnapped, really—to California with
false promises of a meeting with network executives that would reignite her television career.

57.     This is all cynical and desperate nonsense. Regardless of what the Guardian knew
and when, if Defendant Ford, his crew, and the remaining Defendants were genuinely worried
about W.W.H.'s well-being and safety, they easily could have done what Wells Fargo did, which
was to stop the exploitation of W.W.H. Instead, they kept filming, trolling for the most
embarrassing and shocking footage to titillate and sell to their audiences in order to generate more
profit for themselves.

58.     The Program reportedly attracted an average of 1.2 million viewers per night for
Lifetime and over 6 million viewers across all platforms the weekend of its debut. These were

---

[21] Lacey Rose, *Wendy Williams Doc Producers: "If We'd Known She Had Dementia, No One
Would've Rolled a Camera*, Hollywood Reporter (Feb. 26, 2024),
https://www.hollywoodreporter.com/tv/tv-features/where-is-wendy-williams-documentary-
dementia-diagnosis-producers-interview-1235836418/.

record high numbers for Lifetime.  The Program is also currently available to purchase and download from various streaming platforms, including Amazon and Apple TV.

59.     Defendants have profited immensely from their exploitation of W.W.H.  Yet, W.W.H. has hardly seen any of that profit.  In total, after participating in filming sessions on numerous occasions, **_W.W.H. has personally received around $82,000._**  This is a paltry sum for the use of highly invasive, humiliating footage that portrayed her "in the confusing throes of dementia,"[22] while Defendants, who have profited on the streaming of the Program have likely already earned millions.

60.     W.W.H. was once known as the "Queen of All Media."  As an African-American woman in an industry dominated at the top by white men, her accomplishments were hard-fought against significant odds and institutional hurdles.  Defendants not only deliberately destroyed her credibility and image, but they did so when she was incapacitated and unable to consent or avoid being filmed.  Defendants' release of the Program, with its unauthorized use of footage of W.W.H. while patently debilitated and incapacitated, has violated W.W.H.'s rights and caused her to suffer severe injury, loss, and damage.  Defendants have been unjustly enriched by millions of dollars, while cruelly exploiting W.W.H.'s illness.

61.     The profits from the Program should go to W.W.H., who will need significant funding to provide for proper medical care and supervision for the rest of her life.  The Guardian seeks to recover for the damage caused by Defendants, including the unjust profits they received by exploiting W.W.H. in her vulnerable state.

---

[22] *Id.*

## PARTIES

62.     Plaintiff is the court-appointed Guardian for W.W.H. pursuant to Article 81 of the Mental Hygiene Law.  W.W.H. is a resident of New York and subject to guardianship in New York.

63.     Defendant A&E is a Delaware limited liability company headquartered in New York, New York.  A&E Networks is owned by Hearst Communications and The Walt Disney Company.

64.     Defendant Lifetime is a Delaware limited liability company headquartered in New York, New York.  Lifetime is owned by Defendant A&E.

65.     Defendant EOne is a California limited liability company based in Los Angeles, California.

66.     Defendant Creature Films is a California corporation based in Los Angeles, California.

67.     Defendant Mark Ford is an individual residing in Los Angeles, California.

## JURISDICTION

68.     The Court has personal jurisdiction over Defendant A&E because it is headquartered in New York, New York and because it has transacted business within the state of New York in connection with the disputed Contract and Program at issue in this proceeding.

69.     The Court has personal jurisdiction over Defendant Lifetime because it is headquartered in New York, New York and because it has transacted business within the state of New York in connection with the disputed Contract and Program at issue in this proceeding.

70.     The Court has personal jurisdiction over Defendant EOne pursuant to CPLR § 302(a)(1) because it has transacted business within the state of New York in connection with the disputed Contract and Program at issue in this proceeding.

25

Case 1:24-cv-07856-RA   Document 1-10   Filed 10/16/24   Page 27 of 76

71.     The Court has personal jurisdiction over Defendant Creature Films pursuant to CPLR § 302(a)(1) because it has transacted business within the state of New York in connection with the disputed Contract and Program at issue in this proceeding.

72.     The Court has personal jurisdiction over Defendant Mark Ford pursuant to CPLR § 302(a)(1) because he has transacted business within the state of New York in connection with the disputed Contract and Program at issue in this proceeding.

73.     In addition, although Plaintiff denies the validity of the Contract, it is nevertheless worth noting the Contract specifically provides (in Section 24(a)) that the parties thereto agreed to consent to personal jurisdiction in New York.

## VENUE

74.     Venue is proper under CPLR § 503 because Defendants A&E and Lifetime are headquartered in New York, New York and W.W.H. is a resident of New York, New York, and because a substantial part of the events or omissions giving rise to the claim occurred in New York, New York.

75.     Venue is also proper pursuant to CPLR § 501 because the Contract at issue (in Section 24(a)) provides that the parties agree to personal jurisdiction over them as well as venue in the courts of New York, in the County of New York.

76.     Assignment to the Commercial Division is proper pursuant to 22 NYCRR § 202.70(b)(1) because this complaint seeks damages in excess of $500,000, in addition to and equitable and declaratory relief, and because this proceeding concerns claims of misrepresentation, fraud, and other common law violations arising out of business dealings between the parties.

26

Case 1:24-cv-07856-RA    Document 1-10    Filed 10/16/24    Page 28 of 76

## BACKGROUND

### H. W.W.H.

77.     W.W.H. is a 60-year-old woman well-known for her groundbreaking media career. In the 1990s, W.W.H. rose to prominence as a popular radio host on the East Coast who was integral in popularizing and promoting the music of rap, hip hop, and R&B artists to a wider audience.  In 2008, W.W.H. pivoted to television and hosted an extremely popular weekday local and then national talk show for over a decade.  As an African-American woman who created, executive-produced, and solo-hosted her own long-running, nationally syndicated talk show, W.W.H. is as a trailblazer.  She has long been known for her work ethic, her energetic and enthusiastic personality, her unique talent, and her quick-wittedness, which were on display for decades.

78.     W.W.H. appeared on her highly popular daily television talk show from 2008 through mid-2021.  The show averaged 2.4 million viewers per day, and W.W.H. was paid millions of dollars per season.  W.W.H. has appeared in multiple films, numerous television shows, and a Broadway musical.  W.W.H. also published several books and partnered with the home shopping channel HSN (formerly known as the Home Shopping Network) to sell an eponymous line of clothing.

79.     A 2022 article aptly summed up W.W.H.'s legacy and significant cultural impact as follows:

> *A genuine trailblazer in multiple media formats* and the New Jersey stepchild of Howard Stern, Oprah Winfrey, and Joan Rivers, 58-year-old [W.W.H.'s] *imprint is found everywhere in pop culture. She is referenced in dozens of rap and R&B songs,* including the seminal Mariah Carey line in 'Touch My Body,' in which Carey croons, 'Cause they be all up in my business like a [W.W.H.] interview.'  *One of her wigs and a pink bedazzled Ask [W.W.H.] microphone,* among other artifacts, *are on view in the Smithsonian's National Museum of American History* television collection,

> positioning her alongside icons of American television such as *Seinfeld, All In the Family,* and Susan Lucci. *In 2019, she received a star on the Hollywood Walk of Fame.*[23]

## I.  W.W.H.'s Tragic and Widely Publicized Cognitive and Physical Decline

80.     Beginning in late 2017, W.W.H. received significant media attention after public incidents indicated that she was unwell.

81.     On Halloween in 2017, W.W.H. fainted on live television during a broadcast of her show.  Footage of W.W.H. fainting while dressed as the Statue of Liberty was reported on and rebroadcast across a variety of news programs, including *Good Morning America* and *CNN*.[24]

82.     A few months later, in February 2018, W.W.H. announced to her audience that she would take a three-week break from her show, so that she could focus on her health struggles caused by Graves' disease, hyperthyroidism, and lymphedema.[25]

83.     The following year, in January 2019, W.W.H. told fans that she was again taking an extended break from her show.[26]  During her six-week break, W.W.H. went to a facility in

---

[23]     Shamira Ibrahim, *The Misrepresentations of Wendy Williams' Undeniable Legacy*, Vice (Aug. 18, 2022), https://www.vice.com/en/article/pkga98/what-happened-to-wendy-williams-conservatorship-financial-guardianship (emphasis added).

[24]     *See* Good Morning America, *Wendy Williams Faints on Live TV After Overheating*, https://www.goodmorningamerica.com/news/video/wendy-williams-faints-live-tv-overheating-50852490; CNN, *Wendy Williams explains fainting incident*, https://www.cnn.com/videos/health/2017/10/31/wendy-williams-faints-on-live-tv-orig-vstop-aa.cnn.

[25]     *See* Stephanie Petit, *Wendy Williams Suffers from Thyroid Issues & Graves' Disease, Will Take 3-Week Hiatus*, People Magazine (Feb. 21, 2018), https://people.com/tv/wendy-williams-graves-disease/.

[26]     Evan Real, *Wendy Williams Taking an "Extended Break" From Talk Show to Focus on Health*, The Hollywood Reporter (Jan. 18, 2019), https://www.hollywoodreporter.com/tv/tv-news/wendy-williams-taking-an-extended-break-talk-show-1177304/.

28

Case 1:24-cv-07856-RA    Document 1-10    Filed 10/16/24    Page 30 of 76

Delray, Florida.  Around that time, her family was reportedly told by her treating healthcare professionals that W.W.H. was suffering from brain damage.[27]

84.    In May 2020, W.W.H. was once again required to take a medical leave from her show.[28]

85.    W.W.H. filmed her talk show for the last time in July 2021.

86.    In September 2021, the tabloid press reported that W.W.H. was taken to a hospital in an ambulance by police officers for a psychiatric evaluation.[29]  Around this time, rumors began "swirling" that W.W.H., who was then just 57-years old, was suffering from early-onset dementia.[30]  These rumors, reported without attribution, were widely circulated on social media, in the press, and on entertainment talk shows.[31]

---

[27] Molly Claire Goddard, *Wendy Williams Has 'Holes in Her Brain' From 'Alcohol-Related' Damage*, OK Magazine (Feb. 23, 2024), https://okmagazine.com/p/wendy-williams-holes-in-brain-from-alcohol-related-damage/.

[28] Will Thorne, *Wendy Williams Taking Hiatus Due To Health Concerns Surrounding Graves' Disease*, Variety Magazine (May 18, 2020), https://variety.com/2020/tv/news/wendy-williams-hiatus-graves-disease-coronavirus-remote-episodes-1234609999/.

[29] Francesca Bacardi & Carlos Greer, *Wendy Williams Reportedly Taken to Hospital for Mental Health Check*, Page Six (Sept. 16, 2021), https://pagesix.com/2021/09/16/wendy-williams-reportedly-taken-to-hospital-for-mental-health-check/.

[30] iHeart, *Wendy Williams Reportedly Restricted to a Wheelchair* (Nov. 23, 2021), https://www.iheart.com/content/2021-11-23-wendy-williams-reportedly-restricted-to-a-wheelchair/.

[31] *See, e.g.*, *supra* note 22; Hot 97, *Wendy Williams Is Allegedly Confined To A Wheelchair And Showing Early Signs Of Dementia*, https://www.hot97.com/news/wendy-williams-is-allegedly-confined-to-a-wheelchair-and-showing-early-signs-of-dementia/; Keenan Higgins, *Wendy Williams Allegedly Is Confined To A Wheelchair & Is Showing Early Signs Of Dementia* (Nov. 22, 2021), https://rickeysmileymorningshow.com/2706098/wendy-williams-allegedly-confined-wheelchair-showing-signs-dementia/; Simon Delott, *Wendy Williams Unable to Walk, In Early Stages of Dementia* (Nov. 23, 2021), https://www.thehollywoodgossip.com/videos/wendy-williams-unable-walk-in-early-stages-of-dementia-report/.

87.     Tragically, these rumors turned out to be correct.  By this time, W.W.H. was unable to make reasoned decisions and her judgment and insight were severely impaired.

88.     That same month, it was announced that W.W.H. was taking a step back from promotional events and that the season premiere of the thirteenth season of W.W.H.'s show would be delayed.

89.     After that delay was announced, it was reported that W.W.H. appeared on a Zoom call with her show's cast, and the producers became concerned that W.W.H.'s cognitive impairment was such that she could not continue the call, much less continue with the show.  Press reports of this meeting state that W.W.H. "did not seem herself, according to multiple people present, much less able to communicate a clear message, as her speech quickly became muddled and disconnected."[32]  One participant told the press that the call "lasted two and a half, three minutes, and it was not pretty" and that "it was obvious to anyone watching that [W.W.H.] was not going to be back really soon."[33]  Another participant expressed concern that W.W.H. was "starting not to be coherent."[34]

90.     On October 12, 2021, after repeated delays to the start of the thirteenth season of W.W.H.'s show, it was announced that W.W.H. would not return for the season premiere of her show and that guest hosts would fill in instead.[35]

_____

[32] Lacey Rose, Inside the Final Days of 'The Wendy Williams Show', The Hollywood Reporter (Aug. 17, 2022), https://www.hollywoodreporter.com/feature/the-wendy-williams-show-inside-final-days-1235199635/.

[33] Id.

[34] Id.

[35] Leah Bitsky, *Leah Remini to guest host 'The Wendy Williams Show'*, N.Y. Post (Oct. 14, 2021), https://www.foxnews.com/entertainment/leah-remini-guest-host-wendy-williams-show.

30

### J.  Guardianship Proceedings in New York

91.      In New York, guardianship of incapacitated adults is governed by a statute, Article 81 of the New York Mental Hygiene Law ("**Article 81**"), which was enacted in 1992 and became effective in 1993.

92.      Recognizing that a system was required and that "*the needs of persons with incapacities are as diverse and complex as they are unique to the individual,*" the New York legislature found it "*desirable for and beneficial to persons with incapacities to make available to them the least restrictive form of intervention which assists them in meeting their needs but, at the same time, permits them to exercise the independence and self-determination of which they are capable.*"   N.Y. Ment. Hyg. L. § 81.01 (emphasis added).   Thus, New York established a guardianship system "to satisfy either the person or property management needs of an incapacitated person in a manner tailored to the individual needs of that person, which takes in account the personal wishes, preferences and desires of the person, and which affords the person the greatest amount of independence and self-determination and participation in all the decisions affecting such person's life." *Id.*  Under the New York Mental Hygiene Law, courts are required to consider many nuanced factors and determine "*the least restrictive form of intervention*" for the individual in question.

93.      Article 81 guardianships are designed to be flexible and adjusted to an individual's needs.  The powers and duties of a guardian may be limited or broad and may be changed over time by the presiding court, depending on the needs of the ward.[36]  Article 81 guardianships may

---

[36]      In contrast, a guardianship imposed under Article 17-A of the New York Surrogate Court's Procedure Act, is a much more restrictive, "plenary," guardianship, as Article 17-A does not permit the court to limit the scope of an Article 17-A guardianship to an individual's specific needs. Article 17-A was enacted in 1969 for the purpose of enabling parents to continue to serve as

be created for individuals who are incapacitated by reason of dementia, severe mental illness, traumatic brain injury, and other severe medical conditions or injuries which have rendered an individual incapable of managing their own affairs.

94.     To determine whether an Article 81 guardian should be appointed for an individual, a court must examine the available evidence and make certain determinations. *First*, the court must determine whether the appointment of a guardian is "*necessary to provide for the personal needs* of that person, including food, clothing, shelter, health care, or safety, a*nd/or to manage the property and financial affairs of that person.*" N.Y. Ment. Hyg. L. § 81.02(a)(1) (emphasis added). *Second*, the court must determine *either* "*that the person agrees* to the appointment, *or that the person is incapacitated*[.]" N.Y. Ment. Hyg. L. § 81.01(a)(2) (emphasis added).

95.     To determine that an individual is incapacitated, the court must find that that there is "clear and convincing evidence" that the individual "is likely to suffer harm because: (1) the person is unable to provide for personal needs *and/or* property management; and (2) the person cannot adequately understand and appreciate the nature and consequences of such inability." N.Y. Ment. Hyg. L. § 81.02(b) (emphasis added). In making its determination, the court must consider "the functional level and functional limitations" of the person in question, including their "management of the activities of daily living [as defined in § 81.03(h)]"; "understanding and appreciation of the nature and consequences of any inability to manage the activities of daily living"; "preferences, wishes, and values with regard to managing the activities of daily living"; and "the nature and extent of the person's property and financial affairs and his or her ability to manage them." Ment. Hyg. L. § 81.01(c).

---

guardians for children with severe intellectual or developmental disabilities after they reach the age of 18.

Case 1:24-cv-07856-RA    Document 1-10    Filed 10/16/24    Page 34 of 76

96.     In deciding whether a guardian is necessary, the court must consider the report of the court evaluator (an independent individual tasked with interviewing the allegedly incapacitated person ("**AIP**"), the petitioner, and then evaluate various factors enumerated in § 81.09 to determine the needs and wishes of the AIP); and "the sufficiency and reliability of available resources [as defined in § 81.03(e)] to provide for personal needs or property management without the appointment of a guardian."  If the court deems it appropriate, the court evaluator may also retain an independent medical expert.  N.Y. Ment. Hyg. L. § 81.09(c)(7).

97.     If the court determines that a guardian should be appointed under Article 81, the court shall grant the guardian "only those powers which are necessary to provide for personal needs and/or property management of the incapacitated person in such a manner as appropriate to the individual and which shall constitute the least restrictive form of intervention[.]"  N.Y. Ment. Hyg. L. § 81.02(a)(2).

98.     In an emergent situation requiring immediate action, the court may appoint a Temporary or Special Guardian to act until a final decision is reached on the issue of incapacity or to handle specific transactions as directed by the Court.

99.     An Article 81 guardianship proceeding is commenced by filing a petition under oath and providing detailed information regarding the AIP as required by § 81.08 of Article 81. The petitioner may, but is not required to, nominate one or more individuals to serve as a guardian or "standby guardian."  N.Y. Ment. Hyg. L. § 81.08(12).  Once a petition is filed, the court issues an order to show cause setting a hearing date, identifying the individual appointed as court evaluator, and identifying the attorney for the AIP if one has been appointed.  N.Y. Ment. Hyg. L. § 81.07.  The petition and the order to show cause must then be served on the AIP and persons listed in § 81.07(g)(1), including the AIP's parents, adult children, and adult siblings, if any.

33

100.    In an Article 81 guardianship proceeding, the AIP has the right to choose and engage legal counsel of their choice.  N.Y. Ment. Hyg. L. § 81.10(a).  If the AIP is not represented by counsel of their own choosing, the court must appoint counsel for AIP if, *inter alia*, the AIP requests counsel or if the AIP wishes to contest the petition.  N.Y. Ment. Hyg. L. § 81.10(c).

101.    After a guardianship proceeding is initiated, the AIP has the right to contest the petition.  Persons interested in the welfare of the AIP (*e.g.*, family members), are also able to appear in the proceeding and contest the petition, support the petition, or file a cross-petition (*e.g.*, nominating a different individual to serve as guardian, or advocating for a different scope of powers to be granted to the guardian).  An AIP who contests a guardianship petition also has the right to request a trial by jury.  N.Y. Ment. Hyg. L. § 81.11(f).

102.    Before determining that a guardian should be appointed, the court must hold a hearing.  N.Y. Ment. Hyg. L. § 81.11(a).  During that hearing, all parties have the right to present evidence, call fact and expert witnesses, cross-examine witnesses, and be represented by counsel of their own choosing.   N.Y. Ment. Hyg. L. § 81.11(b).   Absent certain extraordinary circumstances, the hearing must be held with the AIP present in-person, either at the courthouse or where the AIP resides if the AIP is unable to travel to the courthouse, "so as to permit the court to obtain its own impression of the person's capacity."  N.Y. Ment. Hyg. L. § 81.11(c).

103.    If the court determines that the appointment of a guardian is necessary, the court is required to make various findings on the record, including, *inter alia*, whether a list of "the specific powers of the guardian which constitute the least restrictive form of intervention consistent with the person's functional limitations."  N.Y. Ment. Hyg. L. § 81.15.  The guardian's specific powers may relate to a person's personal care needs, their property management needs, or both.

Case 1:24-cv-07856-RA    Document 1-10    Filed 10/16/24    Page 36 of 76

104.    The AIP has the right to nominate a guardian of their own choosing, and the court shall appoint that person "unless the court determines for good cause that such appointment is not appropriate."  N.Y. Ment. Hyg. L. § 81.19(c).  In selecting a guardian, the court must consider various factors, including, *inter alia*, the "the educational, professional and business experience relevant to the nature of the services sought to be provided"; "the unique requirements of the incapacitated person"; and "any conflicts of interest between the person proposed as guardian and the incapacitated person."  N.Y. Ment. Hyg. L. § 81.19(d).  While family members are often appointed as guardians, courts have discretion to appoint a qualified third party and frequently do so where it is determined to be in the best interests of the AIP.  Reasons why a third party may be appointed instead of a family member include, *inter alia*, the lack of a qualified and/or willing family member to serve as a guardian; bitter family disputes; prior breaches of fiduciary duties or financial or other abuse by family members; the AIP's expressed wishes; and conflicts of interest.

105.    Once appointed, a guardian is required to provide the court, the court evaluator, the court examiner, and counsel for the AIP, an initial report within 90 days, and then provide annual reports to the court, the court examiner, and counsel for the AIP.  N.Y. Ment. Hyg. L. §§ 81.30-81.31.  Temporary Guardians are only required to account at the end of the term, unless otherwise directed by the Court.

106.    Following the appointment of a guardian, the court may alter or expand the guardian's powers based on the needs of the AIP.  The court may also end the guardianship if the individual regains capacity.  If there is cause to remove the guardian for any reason, the court may do so, and any parties entitled to bring a petition, including the AIP, may move the court to do so. The compensation of a guardian is subject to the oversight of the court, and a determination of reasonable compensation for a guardian must take into account the guardian's duties and services

provided.  N.Y. Ment. Hyg. L. § 81.28.  The court evaluator's fee is likewise determined by the court and must be reasonable.  N.Y. Ment. Hyg. L. § 81.09.

**K.  The W.W.H. Guardianship Proceeding for W.W.H.**

107.    On or about February 14, 2022, Wells Fargo Clearing Services, LLC ("**Wells Fargo**") took the extraordinary step of initiating a guardianship proceeding in Supreme Court, New York County, based on concerns by their employees that W.W.H. was being financially exploited and could not manage her own financial affairs.  The Petition included sworn affidavits from individuals with knowledge of the facts in support of Wells Fargo's Petition.

108.    The Guardian was appointed as Temporary Guardian to W.W.H. with limited powers.

109.    The Court in the Guardianship Proceeding issued a sealing Order for the protection of W.W.H.'s personal information.   Nonetheless, despite the sealing order, leaks and direct statements were given to the media indicating, as was widely reported in the press, that Wells Fargo had initiated a guardianship proceeding concerning W.W.H. and that the Temporary Guardian had been appointed.[37]

110.    ████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████.

---

[37] *See, e.g.*, Winston Cho, *Wendy Williams Placed Under Financial Guardianship, TV Host Claims Misconduct by Wells Fargo*, Hollywood Reporter (May 20, 2022), https://www.hollywoodreporter.com/business/business-newswendy-williams-guardianship-wells-fargo-1235151417/.

Case 1:24-cv-07856-RA    Document 1-10    Filed 10/16/24    Page 38 of 76



111.

112.

113.

114.

115.

38

Case 1:24-cv-07856-RA   Document 1-10   Filed 10/16/24   Page 39 of 76

██████████████████████████████████████████████████████████████

██ .

116.   █████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████ .

117.   █████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████ .

118.   █████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

119.   █████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████ .

120.   █████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

38

121. █████████████████████████████████████

122. █████████████████████████████████████

123. █████████████████████████████████████

124. █████████████████████████████████████

125. █████████████████████████████████████

126. 

127.

128.

129.

130.

131.     The guardianship remains in place, and all proceedings and filings within the Guardianship Proceeding remain under seal.

### L. W.W.H. Continues to Display Troubling Symptoms

132.     Coincidental with the filing of the Petition in February 2022, because W.W.H. was unable to return to host her show, the Wendy Show's producers announced that the show would be permanently cancelled, and that the thirteenth season would be its last.

133.     In a press interview following the show's cancellation, the show's producers reported that W.W.H. had seemed confused and had trouble recalling that her show had been cancelled. According to the producers, they had to explain to W.W.H. that her show had been cancelled several times over a period of four months, even after the decision had already been

40

announced publicly, and each time, W.W.H. "appeared to be having the discussion for the first time."[39]

134.     On or about March 17, 2022, W.W.H. gave a Zoom interview to *Good Morning America* in which she asserted that she would be ready to return to hosting daytime television in three months' time, notwithstanding that her show had been officially cancelled a month earlier. In May 2022, during an appearance on an Instagram Live hosted by Fat Joe, W.W.H. appeared confused and again asserted that she was returning to *The Wendy Williams Show*, which had been permanently cancelled months earlier.  And during a TMZ Live interview, W.W.H. again appeared confused and behaved erratically, at one point holding up her disfigured foot for the camera to show off the effects of her lymphedema.  An executive at Debmar-Mercury, the company that had produced *The Wendy Williams Show*, was later described as horrified by the TMZ Live interview, stating: "***You just don't put somebody like that on live, it was total exploitation***."[40]

135.     By early August 2022, W.W.H.'s readily apparent cognitive decline again was drawing significant public attention.  W.W.H. was reported to have told a celebrity blogger that she had married an NYPD officer.  After Mr. Selby provided a statement to *Page Six* stating that W.W.H. was not, in fact, married, W.W.H. reportedly then called the blogger again, insisting incorrectly that she was married.[41]  Around the same time, W.W.H. also drew scrutiny after she

---

[39] Joey Nofli, *Wendy Williams had to be told several times her show had been canceled, execs say*, Entertainment Weekly (Aug. 17, 2022), https://ew.com/tv/wendy-williams-told-show-canceled/.

[40] Lacey Rose, *Inside the Final Days of 'The Wendy Williams Show'*, Hollywood Reporter (Aug. 17, 2022), https://www.hollywoodreporter.com/feature/the-wendy-williams-show-inside-final-days-1235199635/.

[41] Cedric Thornton, *Wendy Williams Doesn't Back Down on Being Newly Married After her Rep Denies Report*, Black Enterprise (Aug. 4, 2022), https://www.blackenterprise.com/wendy-williams-insists-shes-married-after-her-rep-issues-denial/.

41

was photographed appearing to have fallen asleep inside a retail store,[42] and after a video of her speaking out of a car window and appearing disoriented went viral on Instagram.[43]

### M. Will Selby, The Wendy Experience, Inc., and the August 2022 Development Shoot

136.    By 2022, Will Selby began to hold himself out as W.W.H.'s manager.  Mr. Selby is a jeweler by trade who met and befriended W.W.H. after supplying jewelry to her show when it was still on the air.

137.    Mr. Selby told the Guardian that W.W.H. was desperate to work again, and that he thought W.W.H. could do a podcast because it was similar to talking on the radio, which W.W.H. had done for years before launching *The Wendy Williams Show*.  He thought it would not be difficult for her, and that any recordings could be edited.

138.    Accordingly, he planned to create a podcast, called "The Wendy Experience," to be hosted by W.W.H.  In June 2022, a law firm believed to be acting on the instructions of Mr. Selby, registered a corporation in New York called The Wendy Experience, Inc.  The Guardian was not involved in the formation of The Wendy Experience, Inc.

139.    An Instagram account (@thewendyexperiencepodcast) for the podcast quickly amassed a sizable following, as W.W.H.'s loyal fans grew excited by the project.  A website created at Mr. Selby's direction (www.thewendyexperience.com) sought to capitalize on the interest by selling branded hats and sweatshirts.  But Mr. Selby ultimately proved unable to coordinate the launch of the podcast, and no episodes were ever released.

---

[42] Nikki Schuster, *Wendy Williams Appears to Nap Next to Filled-to-the-Brim Champaigne Glass at Upscale NYC Store*, OK Mag. (Aug. 3, 2022), https://okmagazine.com/p/wendy-williams-worrisome-behavior-nyc-store-fans-shocked/.

[43] Sanda Rose, *Fan Video Shows Wendy Williams In Her Car 'Completely Out of It'*, Sandra Rose (Aug. 1, 2022), https://sandrarose.com/2022/08/fan-video-shows-wendy-williams-in-her-car-completely-out-of-it/.

140.     Defendant Ford, a film producer and the Founder and President of Defendant Creature Films, developed a plan with other Defendants to profit off of W.W.H.'s celebrity and widely reported health issues.  It is this plan and the ultimate product that the Guardian believes grotesquely exploits W.W.H's cognitive and physical impairments, incapacity, and tragic decline.

141.     Defendants proposed to Mr. Selby that they would produce a television series about W.W.H.  Mr. Selby relayed Defendants' representations to the Guardian and told her that the series would cast W.W.H. in a positive light and, in response to the Guardian's express concerns, that A&E would not exploit W.W.H. and, finally, that he would have full creative control.[44]  He expressly said that if he did not want certain footage or a scene to be included, it would not be. Each of these representations turned out to be false.

142.     Beginning in or around August 2022, when W.W.H. was cognitively and physically impaired, Mr. Selby facilitated Defendants' access to W.W.H., including in her own apartment, in order to film her.  Defendants began filming W.W.H. before any written contract was supposedly executed (with no purported contract in place until approximately seven months later).

143.     In August 2022, when filming began, W.W.H. was in no condition to appear on camera, nor could she consent to the project.  This fact was readily apparent to anyone who later saw the Program.  It was widely reported at the time that a Guardian had been appointed given W.W.H.'s inability to understand or handle her own financial affairs, and it had been widely rumored for a year that she was suffering from dementia.  Indeed, the same month that filming began, *The Hollywood Reporter* published a lengthy article saying that insiders from W.W.H.'s long-running talk show had witnessed disturbing episodes months before, during filming in 2021,

---

[44] As Defendant Ford admitted to the *Hollywood Reporter,* that "Will Selby . . . .  was the point of contact with the guardian throughout the process."

Case 1:24-cv-07856-RA   Document 1-10   Filed 10/16/24   Page 45 of 76

where W.W.H. was incoherent and production had to be abruptly cut off after mere minutes. The article also indicated that medical professionals were trying to determine what was causing "symptoms like nonlinear speech, brain fog, memory loss and even hallucinations," that sources close to W.W.H. were confident that substance abuse was not solely to blame, and that there were clearly "other health issues at play."[45]

144. In a February 26, 2024 interview, Mr. Ford admitted that he "one hundred precent" questioned whether W.W.H. was, in fact, ready to work after seeing her at the filming session in August 2022, which he described as a "development shoot." Notwithstanding these concerns, he decided to continue filming W.W.H. anyway.

145. In that same February 2024 interview with *The Hollywood Reporter*, Brie Miranda Bryant, an executive at Lifetime who co-produced the Program on behalf of Lifetime, admitted that she and Mr. Ford knew that W.W.H. was suffering from dementia during filming. Ms. Bryant said, "The diagnosis [of FTD] that was announced was not the information that any of us had going into it. So, people were watching the journey with information that we didn't have *in those first two hours*, and I think that's part of the confusion and the upset and outrage." (Emphasis added.) While it is unclear whether Ms. Bryant meant the first two hours of filming or the first two hours of footage shown in the Program, it is certainly clear that the producers' own observations of W.W.H.'s erratic behavior during filming did not stop them from rolling their cameras or releasing the Program, regardless of her diagnosis.

146. Footage of W.W.H. from the August 2022 development shoot, broadcast publicly in the Trailer and the opening scene of the first episode of the Program, shows that W.W.H. was

---

[45] Lacey Rose, *Inside the Final Days of 'The Wendy Williams Show'*, The Hollywood Reporter (Aug. 17, 2022), https://www.hollywoodreporter.com/feature/the-wendy-williams-show-inside-final-days-1235199635/.

incapable of providing consent for anything, much less for being filmed. The footage is difficult to watch, as it is clear that W.W.H. does not understand where she is or what is going on. W.W.H. is dressed in a startlingly revealing outfit and is not wearing shoes. She breaks down into tears several times with little or no warning, and her moods swing between emotional, distressed, aggressive, and elated. She behaves erratically and uncharacteristically throughout the interview and exposes her breasts to the camera operator. She shows off her feet, which are visibly disfigured from lymphedema.

147. Shortly after the development shoot, W.W.H. was admitted to a wellness facility in New York, and was then transferred to a facility in California for extended treatment and care.

**N. The Contract Between The Wendy Experience, Inc. and EOne**

148. The Wendy Experience, Inc. and EOne executed the Contract. The Contract is titled "Re: UNTITLED WENDY WILLIAMS PROJECT (WT) – ON-CAMERA TALENT AGREEMENT" and dated November 30, 2022. The Contract, with amendments and addendum, is annexed hereto as "**Exhibit C**."

149. The Contract provides, *inter alia*, that The Wendy Experience, Inc. will "lend" W.W.H. for the filming of a nonfiction project. The Contract further provides that EOne will produce the nonfiction project for A&E.

150. The Contract contains several highly unusual and deeply troubling provisions which establish that the Contract was not negotiated with W.W.H.'s best interests at heart:

- The Contract provides that "any injury [W.W.H.] may suffer and any treatment [W.W.H.] may receive may be filmed and broadcast, exhibited, and otherwise exploited" by EOne and A&E;

- The Contract does not grant W.W.H. or her representatives any authority to exercise any control over the final product or the use of any footage filmed in connection with the Program, notwithstanding that W.W.H. is identified as an "executive producer" and that her severe cognitive and physical impairments placed her in a highly vulnerable position with little to no control over her own behavior.

- Similarly, the Contract grants EOne authority "to enter upon and use [W.W.H.'s home], the contents thereof and the appurtenances thereto," without any limitation or requirement for prior warning or notice. Given W.W.H.'s fragile condition and cognitive impairment, such unfettered access was harmful to her.

- The Contract includes an "Addendum" in which W.W.H. purportedly waives all physician-patient privilege in connection with the filming of the project, and authorizes EOne to engage in "photographing, filming, recording, and portraying" W.W.H.'s medical consultations and examinations, "including by not limited to [the filming of W.W.H.'s] test results, medical reports, prescriptions, and/or medical charts." W.W.H. was obviously in no position to consent to the release of her private medical information, and even the Guardian was not permitted to release such information without court approval. Given W.W.H.'s fragile condition and her cognitive impairment, the presence of a film crew during her medical appointments and tests plainly would have interfered with her care. The Addendum bears an illegible signature of the "CEO" of The Wendy Experience, Inc. and was also purportedly signed by W.W.H. on February 17, 2023.

- Finally, the Contract includes an unsigned amendment, dated March 1, 2023, which details each party's remedies under the Contract if W.W.H. is unable to perform "by

reason of" illness, mental, physical or other incapacity, and authorizes EOne and/or A&E in their discretion to require W.W.H. to submit to a medical examination performed by a doctor of their choosing.

151.     Attached to the Contract is a side letter dated February 16, 2023, pursuant to which EOne agreed to reimburse W.W.H. a fee of $1,000 per shoot day for the cost of hair and makeup. The side letter was purportedly signed by W.W.H. on February 17, 2023.

152.     The Guardian did not authorize the Contract or the Addendum and did not learn of it until March 2023, seven months after the start of filming.

153.     The Contract was signed on January 25, 2023, by the "CEO" of The Wendy Experience, Inc.  It is unclear who the "CEO" of The Wendy Experience, Inc. is and the name in the signature is not legible.  However, it is highly distinguishable from W.W.H.'s signature.

154.     The Contract also bears a signature that purports to be the signature of W.W.H., but looks nothing like W.W.H.'s signature, which is visually distinct



Signature on the Contract                        W.W.H.'s signature

155.     Apart from the signature, which does not appear to belong to W.W.H., there is no evidence that W.W.H. signed the Contract.  In all events, W.W.H. was incapacitated and unable to consent at the time the Contract or its amendments were executed.

**O. The Guardian's Discovery of the Contract and EOne's False Representations Regarding the Program**

156.    On or about March 8, 2023, the Guardian learned that W.W.H. had travelled to California without the Guardian's prior knowledge or authorization, which was required by the court orders in the Guardianship Proceeding.

157.    In the Program, W.W.H.'s trip to California is depicted as a plan hatched by W.W.H. and her publicist Shawn Zanotti.  In Episode 2, in two scenes apparently filmed before the California trip, W.W.H. talks about her secret plan to travel to California without the knowledge of Mr. Selby.  In Episode 3, Mr. Selby is filmed, on or about March 8, 2023, surprised and upset when he finds out that W.W.H. is in California with Ms. Zanotti.  The rest of Episode 3 largely focuses on W.W.H. and Ms. Zanotti during the unauthorized trip to Los Angeles.  At one point, W.W.H. appears to think she is in Florida, not California.  When she was asked what she was doing in California, W.W.H. says simply, "Podcast."  W.W.H. and Ms. Zanotti then go to a purported meeting with NBC executives, at which W.W.H. apparently took off her shoes and showed them her disfigured feet.

158.    Immediately upon learning that W.W.H. was in California on March 8, 2023, the Guardian demanded that W.W.H. be returned to New York.

159.    The Guardian only learned about the purported Contract in the aftermath of the California trip.  On March 14, 2023, W.W.H.'s Court-Appointed Attorney spoke to Jada Jones, Esq., an in-house attorney for EOne, for the first time.  The Court-Appointed Attorney memorialized that conversation in an email sent to Ms. Jones shortly thereafter.  In that email, the Court-Appointed Attorney stated that she had "forwarded the contract annexed to [W.W.H.'s Entertainment Attorney] for review."  The Court-Appointed Attorney further stated: "***My client was not at the time in a position to sign for the reasons you and I discussed,*** but we understand

48

production has moved forward. ***I appreciate that you gave me your assurance that none of the film, photos, reels, etc. obtained will be used, published, exploited, etc. until we resolve the annexed contract proposal***." Accordingly, Defendants were clearly on notice that W.W.H. was unable to consent and that additional approval would be required for any purported Contract to be ratified and for the use or release of any footage Defendants had filmed of W.W.H.

160.     On March 15, 2023, W.W.H.'s Court-Appointed Attorney spoke with Jada Jones and with Blossom Lefcourt, who was EOne's head of legal affairs at the time. During that call, Ms. Jones and Ms. Lefcourt acknowledged that they were aware that the Guardian was serving as Temporary Guardian for W.W.H. and that they had been advised of the Guardian's identity by Mr. Selby. During the call, the Court-Appointed Attorney made clear that the Guardian had ***not*** approved of the Contract and that Mr. Selby did ***not*** have authority to enter into or approve of contracts on behalf of W.W.H. The Court-Appointed Attorney also made clear that, as a first step, W.W.H.'s Entertainment Attorney would need to review and comment on the Contract.

161.     During the March 15, 2023 call, EOne's attorney Blossom Lefcourt assured W.W.H.'s Court-Appointed Attorney that the purpose of the Program was to showcase W.W.H.'s "comeback" and promised W.W.H.'s Court-Appointed Attorney that the Program would only show W.W.H. in a positive light.

162.     During the March 15, 2023 call, ***EOne's attorney Blossom Lefcourt asked the Court-Appointed Attorney whether W.W.H. was cognitively able to participate in the projec***t. Given applicable court orders, the Court-Appointed Attorney declined to comment on W.W.H.'s capacity, but asked Ms. Lefcourt whether the production company had concerns about W.W.H.'s abilities to participate in the filming, at which time Ms. Lefcourt stated that the production

Case 1:24-cv-07856-RA     Document 1-10     Filed 10/16/24     Page 51 of 76

company's views were "mixed" and that there seemed to be some issues that had not been present

when the team had worked with W.W.H. in the past.[46]

163.    Accepting EOne's misrepresentations that the Program would present W.W.H. in a

positive light, the Guardian was made aware of W.W.H.'s participation in additional filming

sessions in March and April 2023, including a day trip to W.W.H.'s hometown of Asbury Park,

New Jersey in March 2023, and a trip by W.W.H. to visit her father in Florida in April 2023.

164.    At no point did the Guardian ever contemplate that Defendants would portray

W.W.H. as a disoriented, agitated drunkard with bulging eyes (a result of her Graves' disease).

The Guardian did not envision that Defendants would put "entertainment" value and profits above

human decency and film W.W.H. when she showed off her breasts and her disfigured feet. After

all, the only purpose of pointing out that W.W.H. did not recognize her childhood home in Asbury

Park would be to ridicule her. The Guardian cannot fathom that Defendants would document

W.W.H. in her apartment while she was unconscious, which they did in April 2023, as shown in

the last episode of the Program. But all of that (and more) is exactly what happened.

165.    In May 2023, W.W.H. received her diagnosis of FTD and PPA and now receives

24-hour care. She is no longer able to participate in any filming anywhere under any circumstances

due to her medical condition.

166.    On or about June 12, 2023, at the Guardian's request, W.W.H.'s Entertainment

Attorney sent EOne's attorney a Non-Disclosure Agreement ("**NDA**") for all individuals, past and

present, who worked on the Program, to sign regarding maintaining the confidentiality of

information learned about W.W.H. during filming for the Program. The NDA prohibited the

---

[46] Some or part of the production crew that worked on the Program had filmed W.W.H. in or about
2020 when she participated in a reality television show about her new, post-divorce life.

unauthorized use or release of any footage created, or confidential information concerning W.W.H. that was learned during the course of filming. Reflecting the parties' awareness that W.W.H. lacked the ability to consent and the Guardian's approval was required, the NDA included a signature line for the Guardian, acting in her capacity as Guardian for W.W.H.

167.   Notwithstanding this exchange, the parties never reached an agreement on an amended Contract, and *the Guardian never approved or signed the Contract itself or any amended version.* Therefore, there was no valid contract authorizing the release of the Program or any related footage of W.W.H., or the use of W.W.H.'s name, likeness, image, or voice. Defendants were well aware that the Contract was void or voidable due to W.W.H.'s lack of capacity and Defendants' failure to obtain the approval of either the Guardian or the Court.

168.   The Guardian never saw the Contract in 2022. She never approved it. She never signed it. She never communicated with anyone at A&E or Lifetime.

169.   At all relevant times, W.W.H. lacked the capacity to enter into the Contract or any similar agreements. Pursuant to the terms of the guardianship, after April 2023, only the Guardian has the authority to approve, modify, or cancel any such contracts.

170.   At all relevant times, W.W.H., due to her cognitive and physical impairments, has been unable to carry out the demands of filming, participating in, or promoting the project as purportedly required by the Contract. Moreover, W.W.H.'s condition has continued to decline, and since May 2023, she has not participated in any filming or interviews.

171.   Since that time, W.W.H. cannot participate in any further interviews or filming because such activities are overly stimulating and detrimental to her health and wellbeing given her medical condition.

172.    In the press, Mr. Ford has falsely claimed that Defendants, on their own, chose to stop filming W.W.H. in April 2023 due to her poor health.  In reality, filming ceased because the Guardian, following the advice of W.W.H.'s healthcare providers, refused to allow Defendants to conduct any further filming of W.W.H.  After May 2023, Defendants made multiple requests, which were relayed to the Guardian by Mr. Selby, for W.W.H. to participate in further filming for the Program, including in August, September, and October 2023, all of which the Guardian denied based on the advice of W.W.H.'s treating physicians.

## P. W.W.H.'s Diagnosis of Frontotemporal Dementia and Primary Progressive Aphasia

173.    In May 2023, W.W.H. was formally diagnosed with FTD and PPA by doctors at Weill Cornell Medical Center.  These conditions are progressive and incapacitating.

174.    FTD is a neurodegenerative disease which affects the frontal and temporal lobes of the brain, which are associated with behavior, personality, language, executive functioning, including decision-making and judgment, and impulse control.  The symptoms of FTD include personality changes, agitation, lack of insight, and deficits in executive function, including impairment in decision-making and judgment.  FTD may also result in inappropriate behavior and impulsivity, abrupt changes in mood, and excessive alcohol consumption.  FTD is a progressive disease, meaning that there is no cure and the symptoms only get worse over time.

175.    Because there is no single diagnostic test for FTD, the process for diagnosing FTD on average takes more than three years from the disease's onset.

176.    Individuals with FTD may exhibit a symptom known as "anosognosia," meaning they lack insight into their own condition and symptoms.  In other words, due to the degenerative changes to their brain, they are not aware of their disease, the extent of their impairment, or the impact of their symptoms on others.

52

Case 1:24-cv-07856-RA    Document 1-10    Filed 10/16/24    Page 54 of 76

177.    PPA is caused by atrophy of regions of the brain that control speech and language. Individuals with PPA have difficulty finding words and understanding spoken and written language.  The condition worsens over time until the individual eventually loses their ability to speak and write.

178.    There are currently no known treatments that would cure the progression of these conditions, although a calm, orderly environment and regular routine may slow their progression.

### Q. The Release of the Trailer

179.    On February 2, 2024, Defendant A&E released the Trailer for the Program and announced that it would be aired on Lifetime Networks on February 24 and 25, 2024.

180.    The Guardian was shocked at this news.

181.    The Trailer depicts W.W.H. in a humiliating and degrading manner.  As reported in the *Los Angeles Times*: "***Williams is shown inebriated, struggling to stand, tearful and seemingly suffering memory loss – all while insisting to friends and family she is of sound mind.***"[47]

182.    The Guardian had previously made clear to Mr. Selby that no footage could be released without approval by the Guardian and possibly the court.  The Guardian was assured by the exchange between W.W.H.'s Court Appointed Counsel and EOne's attorneys that no footage of W.W.H. would be released until after the Guardian had approved amendments to the Contract.

183.    Although the Guardianship Proceeding is sealed, the fact that W.W.H. is subject to a guardianship had become public knowledge and received widespread media coverage by the time Defendants began filming for the Program in August 2022.

---

[47] Malia Mendez, *Wendy Williams Resurfaces in Trailer for Her Lifetime Documentary Debuting this Month*, L.A. Times (Feb. 2, 2024) (emphasis added), https://www.latimes.com/entertainment-arts/tv/story/2024-02-02/wendy-williams-resurfaces-lifetime-documentary-debuting-this-month.

184.    Mr. Selby told the Guardian that he would have final creative control over the finished product and that the documentary would portray W.W.H. in a positive light.  Mr. Selby also shared photos of W.W.H. on set looking happy and excited, as depicted above.

185.    Moreover, during the period of the Program's filming, in late November 2022, W.W.H. successfully made a public appearance at the WBLS 107.5 Circle of Sisters 2022 event, in New York.  During that event, W.W.H. was gently interviewed for 30 minutes by WBLS personality Jus Nik.  Coverage of that event was generally positive.[48]  The Circle of Sisters event demonstrated that despite the many limitations imposed by her condition, with the right interviewer, W.W.H. *might* successfully appear for short stretches of time and be portrayed in a positive light.

186.    On February 2, 2024, the Trailer was released without the prior knowledge or consent of the Guardian.  Neither W.W.H. nor the Guardian saw the Trailer before it was released publicly.  Neither W.W.H. nor the Guardian were offered an opportunity to view the Program before its public airing on February 24-25, 2024.

187.    Defendants, through Mr. Selby and EOne's attorneys, made representations to the Guardian and to W.W.H.'s attorneys, respectively, that the planned project would be a positive tribute to W.W.H. and her legacy.  However, the Trailer made it clear that the Program would be anything but positive.  The Trailer cruelly portrays W.W.H. as deeply confused and erratic, and very obviously cognitively and physically impaired.  W.W.H., long known for being glamorous, is shown disheveled and disoriented.  Her emotional state fluctuates wildly, and she repeatedly yells.  As a February 2, 2024 *AV Club* article reports, the Trailer shows "a number of—frankly

---

[48]    *See, e.g.*, Alexandra Del Rosario, How's Wendy Williams Doin'?, L.A. Times (Nov. 23, 2022),        https://www.latimes.com/entertainment-arts/story/2022-11-23/wendy-williams-first-public-appearance-health-issues-love-new-podcast.

pretty disturbing—clips of [W.W.H.] in various states of distress" which are "all pretty challenging to watch."[49]

188.    W.W.H. was obviously completely incapable of giving her consent to her portrayal in the demeaning Trailer, and the Guardian did not authorize the release of the Trailer.

189.    The release of the Trailer and related footage caused a firestorm of negative publicity for W.W.H.  Unflattering pictures and footage of W.W.H. were widely published across all forms of media, with W.W.H. portrayed as a laughingstock and drunkard as a result of Defendants' marketing of the Program.

190.    Damaging and humiliating headlines caused by the Trailer include:

- *Where Is Wendy Williams? Shocking Doc Reveals Star's Struggles with Money Woes, Health Issues and Alcohol*, People (Feb. 2, 2024).

- *Wendy Williams Breaks Down Crying Over Finances in Documentary Trailer: 'I Have No Money'*, Entertainment Tonight (Feb. 2, 2024).

- *Wendy Williams Bombshell Documentary Details Her Struggle With Alcohol, Money & More*, Entertainment News (Feb. 2, 2024).

- *Former Talk Show Host's Alcoholism, Financial Troubles and Mental Health Issues Laid Bare in New Doc*, Wonderwall (Feb. 5, 2024).

- *Wendy Williams's life of tragedy - revealed: Decades-long plastic surgery obsession, her husband's SECRET family, and the voracious addictions that left her broke*, The Daily Mail (Feb. 7, 2024).

191.    Promotional materials list W.W.H. as "Executive Producer" of the Program. Despite the disturbing nature of the Trailer and the Program, in which W.W.H. appears obviously impaired and confused, Defendants have falsely insisted that W.W.H. somehow "executive produced" the Program and falsely indicated that she endorsed the final product.

---

[49] Emma Keates, *The First Trailer for Lifetime's Wendy Williams Documentary is Really Upsetting*, AV Club (Feb. 2, 2024), https://www.avclub.com/lifetime-wendy-williams-documentary-first-trailer-1851221559.

192.     On February 22, 2024, the Guardian obtained an *ex parte* Order to Show Cause (the "**TRO**") temporarily restraining Defendants A&E and EOne from releasing the Program.  In the papers supporting the application for a TRO, the Guardian affirmed under oath that W.W.H. lacked capacity to consent to the Contract, that W.W.H. was diagnosed with FTD and PPA in May 2023, and the Guardian never approved the Contract.

193.     On February 23, 2024, A&E and EOne successfully moved in the Appellate Division, First Department pursuant to CPLR § 5704 for an Order vacating the TRO on First Amendment grounds.  By this point, Defendants were clearly determined to profit off of W.W.H.'s incapacity and tragic decline no matter what.

194.     In support of A&E and EOne's motion in the Appellate Division, Defendant Ford submitted an affirmation in which he admitted that he and his team learned of W.W.H.'s dementia diagnosis *during* filming.  Yet, they continued filming anyway.  At one point in the Program, W.W.H.'s son says he was aware of her cognitive issues well before the filming took place and that he (and a doctor) attributed them to alcohol-induced dementia.  W.W.H's sister says the family met with producers at the onset of filming.  If this is true, presumably the Defendants were made aware of W.W.H.'s cognitive issues, regardless of the cause, prior to shooting the Program.  Yet, they persisted in filming a person in the throes of dementia.

195.     Mr. Ford does not admit that he was aware of earlier published reports that W.W.H. was impaired and suffering from dementia.  But a simple Google search would have yielded such information.  It is also completely implausible that Defendants were unaware of the fact that W.W.H. had been placed into a guardianship several months before filming, again due to her inability to manage her own affairs.

56

196.     Shamelessly, Mr. Ford states that W.W.H. is a "longtime public figure well known for sharing her authentic self with her audience," implying that her prior willingness to share some aspects of her life with her fans now makes her serious illness fair game for public consumption, regardless of her inability to consent.

197.     Unabashed, in their motion in the Appellate Division, Defendants made the false claim that the Guardian only sought to prevent the release of the Program out of concern for how *the Guardian* would be depicted rather than out of concern for W.W.H.  These claims are baseless. The Guardian received authorization from the Court in the Guardianship Proceeding before bringing this action to enforce the rights of W.W.H. and obtain relief for W.W.H.  It is absurd to suggest that any individual charged with acting in W.W.H.'s best interests would consent to the exploitative Program or sit idly by while Defendants profit from W.W.H.'s incapacity and tragic decline.

198.     It is also disingenuous for Defendants to attempt to portray the Program as a "documentary" examining the New York guardianship system in general, or W.W.H.'s guardianship in particular.  The Program does not reference any legal aspects of the guardianship system and lacks any coherent theme other than the public humiliation of W.W.H., whether by presenting her as an alcoholic or exploiting her dementia.  To now falsely depict the Program as an exposé of guardianships is nothing more than an unseemly, last-minute attempt to deflect attention from Defendants' own wrongdoing.

199.     On or about February 22, 2024, after obtaining permission from the court in the Guardianship Proceeding, W.W.H.'s care team issued a press release (the "**Press Release**") informing the public that in May 2023, W.W.H. was diagnosed with FTD and PPA.

Case 1:24-cv-07856-RA    Document 1-10    Filed 10/16/24    Page 59 of 76

### R. The Release of the Program

200.     Shamefully, Defendants were undeterred by the public revelation of W.W.H.'s diagnosis of FTD and the Guardian's affirmation that W.W.H. lacked capacity to consent and that the Guardian had not approved the Contract.

201.     On February 24 and 25, 2024, Defendants released the Program on Lifetime and streaming platforms.  The Program is also available for purchase and download through platforms including Amazon and Apple TV.

202.     The Program, which consists of four episodes over 2 nights totaling approximately 4.5 hours without commercials, reportedly attracted an average of 1.2 million viewers per night for Lifetime and over 6 million viewers across all platforms the weekend of its debut.  These viewership numbers are reportedly record high numbers for Lifetime since it released a documentary concerning Janet Jackson a few years ago.

203.     The Program opens with W.W.H. stating "*I love vodka!*" after being pressed about alleged alcohol abuse by Mr. Ford or another male producer during an interview filmed in August 2022.  Shortly thereafter, during the same interview, an off-camera voice asks W.W.H. where she is in her journey.  W.W.H. responds by blurting out that she is glad to be free of her talk show so that she can "*show my boobs*" and then pulls down the front of her top, grabs her nipples, and gives the middle finger.  Even that erratic behavior at the outset was apparently not enough to halt filming.

204.     Throughout the interview, W.W.H.'s eyes bulge severely due to Graves' disease, the camera angle shoots up W.W.H.'s short skirt, and W.W.H. is barefoot.  At one point, she shows off her misshapen feet, which have become horribly swollen due to her lymphedema.  W.W.H. is shown sobbing multiple times under the producer's questioning, much of which concerns alcohol.  She becomes agitated and impatient, stating "Next question, please" when the producer tells her

58

that some people worry about losing her, and asks if she understands how much people love her. The once loquacious talk show host has trouble finding words and providing coherent responses. No one who met W.W.H. would believe for one second that W.W.H. had capacity to consent to being filmed or would want to be depicted in this manner.

205.    The Program does not improve over the next four-plus horrifying hours.  W.W.H. is interviewed, eyes severely bulging, wearing only a gray bathrobe.  Once again, W.W.H. is asked repeatedly about alleged alcohol use.  When W.W.H. is questioned about her recent stay at a wellness center, she becomes increasingly agitated and tells everyone to "stop talking please" about the wellness center.

206.    Despite Defendants' promises that W.W.H. would be shown in a positive light, nothing in the Program flatters her.  The Program invites its audience to ogle at W.W.H.'s fall from grace.  It shows W.W.H. when she is at her most vulnerable—often literally in a state of undress and sometimes in her bed—and encourages viewers to gawk at W.W.H.'s erratic behavior and inability to regulate her emotions, which are all symptoms of FTD.  Despite her decades of success as a bright and eloquent speaker, as a result of Defendants' exploitation, W.W.H. will now forever be remembered as she is depicted in the Program—at her lowest moment.  As *Variety* wrote in its review, this "is not a series about the next chapter of [W.W.H.'s] life but instead ***an exploitative display of her cognitive decline and emotional well-being***."[50]

207.    W.W.H. is disoriented and agitated in nearly every scene; she makes *non sequiturs* and incoherent remarks, the results of aphasia; she is shown partially clothed or exposed, including showing her in bed in her bra, and even without a wig, with close-up footage of her balding head.

---

[50] Aramide Tinubu, 'Where is Wendy Williams?' *Docuseries Is Unsettling and Exploitative*, Variety (Feb. 24, 2024), https://variety.com/2024/tv/reviews/where-is-wendy-williams-review-lifetime-1235920928/.

Surely, this was not by choice.  As many W.W.H. fans and friends have commented upon seeing the Program, W.W.H. **never** would have agreed to appear publicly without a wig—she famously even wore one in the swimming pool.

208.    The response to the Program was immediate, with many fans of W.W.H., cultural commentators, and media outlets vehemently criticizing Defendants for their unethical exploitation of a woman who is evidently experiencing severe cognitive and physical decline:

- *The Guardian* – [I]n capturing [W.W.H.] like this, *Where is Wendy Williams?* is doing the very thing it purports to be exposing – exploiting a declining star and turning her pain into profit."[51]

- *The Daily Mail* – "It all feels gross.  As anyone who loves someone with dementia knows, their personal dignity is the first thing to go.  To have that stripped so very publicly — when it seems [W.W.H.] doesn't have the cognition to assent — is particularly gruesome."[52]

- *'Collider* – "It's beyond disappointing that not one person on the Lifetime network's production or distribution team realized the disservice being done to [W.W.H.], her family, her fans and, quite frankly, to television history, by pushing the green light on Saturday, February 24th."[53]

---

[51] Tayo Bero, *Is the Wendy Williams Docuseries Saving a Vulnerable Person, or Exploiting Her?*, The Guardian (Mar. 1, 2024), https://www.theguardian.com/commentisfree/2024/mar/01/wendy-williams-docuseries-exploitation.

[52] Maureen Callahan, *TV's Ghoulish New Low: Dementia-Hit Wendy Williams is Reduced to a Sideshow Freak as Relatives Crawl into her Fading Spotlight*, Daily Mail (Feb. 23, 2024), https://www.dailymail.co.uk/tvshowbiz/article-13116139/Wendy-Williams-dementia-documentary.html

[53] Christal Jordan, *The Wendy Williams Docuseries Is an Invasion of Health Privacy*, Collider (Feb. 26, 2024), https://collider.com/where-is-wendy-williams-docuseries/.

- *Black Entertainment News* – "If hell is real, I have some nominees who belong in one or more of its seventh circles. It only took me one minute of watching Lifetime's *Where Is Wendy Williams?* to know it didn't belong on television."[54]

- *Today* – "She can't consent to being on camera like this. It feels exploitative."[55]

- *The New York Post* – "This series is invasive. It's uncomfortable. It's inhumane."[56]

209. To the extent that Defendants now claim, in their desperate damage control efforts, that the Program was intended to somehow shed light on dementia, that statement is plainly false to anyone who has viewed the Program. The Program was not about dementia. It was first about supposed alcoholism and alcohol abuse, front and center, and then later about exploiting a person with dementia, all for financial gain.

210. Prior to the issuance of the Press Release by W.W.H.'s care team, announcing her diagnoses of FTD and PPA, Defendants never acknowledged or made any reference to the fact that W.W.H. was suffering from dementia, including in the Trailer, even though they had plainly known about it, even by their own account, for several months including during filming. They had captured obvious symptoms on film and were told about it by W.W.H.'s family, and they admitted to W.W.H.'s Court-Appointed Attorney in March 2023 that they had concerns regarding W.W.H.'s capacity and inability to consent. Despite this, dementia is not mentioned until near the

---

[54] Michael Arceneaux, *Lifetime's* 'Where is Wendy Williams' *Documentary Should Raise Concerns Over Ethics and Accountability*, Black Entertainment Television (Feb. 29, 2024), https://www.bet.com/article/zsovam/opinion-lifetimes-where-is-wendy-williams-should-raise-concerns-over-ethics-and-accountability.

[55] Francesca Gariano, *Fans React to 'Where is Wendy Williams' Lifetime Doc*, Today (Feb. 25, 2024), https://www.today.com/popculture/tv/where-is-wendy-williams-documentary-reactions-rcna140377.

[56] Kristen Fleming, *None of Us Should Watch the Heartbreaking Wendy Williams Documentary*, N.Y. Post (Feb. 28, 2024), https://nypost.com/2024/02/28/entertainment/where-is-wendy-williams-is-a-heartbreaking-docu-series/.

Case 1:24-cv-07856-RA    Document 1-10    Filed 10/16/24    Page 63 of 76

end of the fourth and final episode in the 4 and a half hour-long Program, and then only in passing. It is never explored or explained. There is not even a disclaimer explaining that W.W.H. suffers from FTD and PPA, which explains her behavior in each and every episode and scene of the Program—presumably because that would make any ordinary viewer see the Program for what it actually is: shameful exploitation of an ill, vulnerable woman. As the *New York Times* reported: "Though [W.W.H.'s] dual diagnoses of progressive aphasia and frontotemporal dementia made headlines in the days before 'Where Is Wendy Williams?' aired, ***there was barely any mention of the conditions in the [Program]***."[57]

211.    Moreover, even though Defendants knew that W.W.H. was suffering from dementia, Defendants hid that information from the public during their promotion of the Program, even falsely claiming that they had no idea what was wrong with W.W.H.

212.    In fact, Defendants portrayed W.W.H. as an aging alcoholic whose mind was slipping away due to her own vices, knowing that if viewers knew, in advance, that they were exploiting a woman disabled by dementia, the public outcry would be enormous, which, thereafter, it was. The Program portrays W.W.H.'s memory lapses and outbursts with no context or explanation. Cruelly, production team members repeatedly and doggedly ask W.W.H. about her alleged alcohol use, and throughout the Program the drumbeat is that W.W.H.'s behavioral symptoms have been caused by a lack of willpower and too much drinking. In reality, W.W.H. has a diagnosis of FTD and PPA, which are devastating and incurable conditions.

213.    Alcohol use is featured prominently in the Program and referenced dozens of times. In one scene, W.W.H. is filmed while out for dinner at a restaurant in Manhattan with Mr. Selby.

---

[57] Shivani Gonzalez, *'Where Is Wendy Williams?': 5 Takeaways From the Documentary*, The New York Times (Feb. 26, 2024), https://www.nytimes.com/2024/02/26/arts/television/wendy-williams-documentary-takeaways.html.

As part of this scene, Defendants show Mr. Selby conferring with restaurant servers and telling them not to serve alcohol to W.W.H. Similarly, in undated footage which appears to have been staged, Mr. Selby is shown confronting W.W.H. with a half bottle of vodka, accusing her of drinking all of it. And later, during a trip to Miami in April 2023, Defendants staged a scene in which Mr. Selby is shown calling hotel staff from a hotel phone to tell them not to serve W.W.H. alcohol. In a separate scene, W.W.H. is shown drinking an orange juice, while one producer comments that W.W.H. is "too drunk" and another sneers: "That's a big mimosa, Wendy." Another scene opens with a close-up of a liquor bottle. Elsewhere, Defendants take W.W.H. to a restaurant and order alcohol for her, all while repeatedly insinuating that W.W.H. struggles with alcohol abuse.

214.    In another undated scene, which appears to have been filmed in or around February 2023, Defendants film W.W.H. as she sits in an SUV as it circles the block and idles outside a vape shop in Manhattan. This scene was apparently filmed over the span of a few hours, as the sun has set, and the sky has turned dark by the end of the scene. The apparent purpose of this scene was to show viewers that W.W.H. was disoriented and could not remember whether the SUV had already passed the same vape shop; that W.W.H. appeared not to recognize the neighborhood where her talk show had been filmed; and that W.W.H. eventually grew restless and agitated after spending an extended period of time being filmed in the back seat of an SUV. This scene was manufactured to cruelly exploit W.W.H. and her disabilities.

215.    In undated footage toward the beginning of the Program, Defendants require W.W.H. to visit a "personal trainer" who pushes W.W.H. to do seemingly simple, everyday tasks on camera—such as grabbing a weight pole and stepping up and down on a platform—which W.W.H. is unable and unwilling to perform due to her physical impairments. It seems that W.W.H.

had never met this personal trainer before, and these exercises were not part of her regular or approved exercise regimen. By all appearances, the purpose of this sham scene was to place W.W.H. in a physically and emotionally uncomfortable situation to create shock-factor reality TV content exploiting W.W.H.'s disabilities, again lacking any human empathy and purely for "entertainment" value.

216. Even worse, in many instances, the film crew's pushy and aggressive questioning of W.W.H. appear to be exacerbating W.W.H.'s symptoms, causing or increasing her agitation, which the Program then plays up for perceived "entertainment" value. Disgustingly, she is repeatedly asked questions for no apparent purpose other than to capture, on camera, her apparent despair, confusion, aphasia, and agitation, as though she is a circus animal performing amusing tricks for Defendant Ford and his film crew. But the show is not amusing—it is deeply unsettling and utterly horrifying to any human being with a moral compass.

217. Defendants' release of the Program has caused W.W.H. to suffer irreparable injury, loss, and damage due to misappropriation of W.W.H.'s labor, the embarrassing, harmful, and degrading nature of the Program, and Defendants' false representations that W.W.H. "executive produced" and actually endorsed the Program. W.W.H. has suffered irreparable harm to her reputation, legacy, and any remaining future earning potential. W.W.H. has also suffered irreparable harm in the form of damaging, intrusive, and unwarranted publicity, which will only impact her negatively and jeopardize her privacy, health, and safety for the rest of her already severely diminished life.

218. Defendants' assertions to the press that the Program is somehow educational, or a public service, or that Defendants had W.W.H.'s best interests in mind, are blatant lies that would not fool a five year-old. Defendant Ford's self-serving statements to the press that Defendants are

"very relieved" that they "left [W.W.H.] in a better place then we found her" are delusional and (intentionally) ignore reality. Defendants did not stop filming W.W.H. for their exploitative Program because *they* decided that it was time to stop due to her medical condition; they even admit that they did not stop once they learned of her dementia. Rather, filming stopped after May 2023 because *the Guardian* said it was inadvisable for W.W.H. to participate in any further filming based on medical advice. Defendants requested that WW.H. be made available for filming as recently as October 2023; the Guardian denied those requests.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
*Declaratory Judgment*
*(Against EOne and A&E)*

219.    Plaintiff repeats and realleges the foregoing paragraphs.

220.    ████████████████████████████████████

███████████████████████████████████████████ The order appointing a temporary guardian for W.W.H. was widely reported in the press at the time.

221.    ████████████████████████████████████

███████████████████████████████████████████

████████████████

222.    In May 2023, W.W.H. was diagnosed with FTD and PPA. These conditions are progressive and incurable. The symptoms of these conditions include aphasia, personality changes, agitation, lack of insight, and deficits in executive function, including impairment in decision-making and judgment.

223.    ████████████████████████████████████

███████████████████████████████████████████

███.

65

224.    Defendants EOne and A&E claim to be in possession of a supposed Contract that purports to bind W.W.H. to an agreement regarding a nonfiction film project concerning her life to be produced by Defendant EOne for Defendant A&E.

225.    The Contract is dated November 2022 and was purportedly executed on January 25, 2023, with amendments allegedly signed on February 17, 2023, and an additional amendment prepared in March 2023.  The Guardian was not involved with the Contract or the creation of the entity, The Wendy Experience, Inc., that executed the Contract.

226.    When the Contract was purportedly executed, , a fact that was widely reported in the press and known to Defendants, making it clear that W.W.H. was in no condition to enter into the Contract.  Shortly after the Contract was purportedly executed, ████ ██████████████████████████████████████████████████████ . Neither the Guardian nor the court in the guardianship proceeding approved the Contract or its terms.

227.    Given W.W.H.'s diagnosis and the symptoms that led to the appointment of the Guardian and the diagnosis, ████████████████████████████████████ ██████████████████████████████████████████ , and the behavior of W.W.H. filmed by Defendants, it is apparent that W.W.H., at all relevant times, was, and remains, incapacitated and incapable of consenting to the Contract.

228.    Defendants at all relevant times knew or should have known that W.W.H. was incapable of consenting to the Contract.  Rumors that W.W.H. was suffering from dementia were widely reported before the Contract was purportedly signed, and likewise the fact that W.W.H. had been placed under a guardianship ████████████████████████████████

███ was also widely reported. What's more, any person coming into contact with W.W.H., at the time the Contract was executed would have been aware of her severe cognitive and physical impairments.

229.     The Contract, which provides that W.W.H. shall have no control over how she is portrayed in the Program, is obviously exploitative—as has been demonstrated by Defendants' release of the Trailer and Program, which shows W.W.H. in an impaired state and seeks to humiliate and make a spectacle of her for "entertainment" value and Defendants' financial gain.

230.     W.W.H did not sign the Contract. The Contract bears a signature that purports to be the signature of W.W.H., but it is not her signature.

231.     There are signatures on the February 17, 2023 amendments to the Contract that purport to belong to W.W.H. On information and belief, W.W.H. did not sign the amendments.

232.     In all events, due to her incapacity, including her FTD and PPA, W.W.H. was at all relevant times incapable of comprehending and understanding the nature of the transaction at issue, and was unable to control her conduct.

233.     Pursuant to Article 81.29(d) of the Mental Hygiene Law, "[i]f the court determines that [a] person is incapacitated and appoints a guardian, the court may modify, amend, or revoke . . . any contract, conveyance, or disposition during lifetime or to take effect upon death, made by the incapacitated person prior to the appointment of the guardian if the court finds that the previously executed . . . contract, conveyance, or disposition during lifetime or to take effect upon death, was made while the person was incapacitated . . . ."

234.     As a result of Defendants' apparent intent to rely on the terms of the Contract to defeat W.W.H.'s claims in this proceeding, there exists an actual and justiciable controversy.

235.    Because W.W.H. did not sign the Contract and was, at all relevant times, incapable of consenting to or understanding the terms of the Contract, and because neither the Guardian nor the court in the guardianship proceeding approved the Contract, the Contract should be declared null, void, and of no effect.

## SECOND CAUSE OF ACTION
*Unjust Enrichment*
*(Against All Defendants)*

236.    Plaintiff repeats and realleges the foregoing paragraphs.

237.    Defendants have been considerably enriched by their exploitation of W.W.H.'s labor. At the time of this pleading, media reports state that several million people in the United States have viewed the Program, and that the Program's ratings surpass other widely watched programs aired by Defendant Lifetime in recent years.

238.    Defendants have been unjustly enriched by retaining the proceeds derived from the Program.

239.    Defendants have further been unjustly enriched by the publicity and media attention that the Program has received, which Defendants have used to promote themselves, their platforms and channels (including Lifetime), and other projects by Defendants, including Lifetime's recently announced upcoming made-for-TV movie "The Bad Guardian," which Lifetime shamelessly plugs by referring to W.W.H. in promotional materials for the movie.

240.    Defendants' enrichment has been at the expense of W.W.H.

241.    In connection with the filming of the Program, W.W.H. spent time both on-camera and off-camera with Defendants, thereby performing labor for which she has not been adequately compensated, and pursuant to a purported Contract which she did not sign, lacked the capacity to enter into, and which was not authorized by the Guardian or the court overseeing W.W.H.'s guardianship.

242.     Defendants obtained W.W.H.'s labor through exploiting her incapacity and through fraudulent representations regarding how she would be portrayed.  To add insult to injury, Defendants intentionally manipulated and goaded W.W.H.—who is unable to effectively self-regulate her emotions due to her FTD and PPA—in an effort to trigger strong emotional reactions and acquire humiliating footage, including by placing her in physically and socially uncomfortable situations.

243.     Defendants' actions have caused harm to W.W.H. by wrongfully appropriating her labor and irreparably damaging her reputation and future earning ability by cruelly depicting her in a disoriented state.  Defendants' conduct has further harmed W.W.H. by creating a firestorm of unwarranted and largely negative publicity that jeopardizes the privacy and welfare of W.W.H.

244.     Permitting Defendants to retain the proceeds and other benefits they have enjoyed by unconsciously exploiting W.W.H.'s dementia for profit would be unjust and inequitable. Equity and good conscience require that Defendants be required to disgorge all amounts they received in connection with the Program and pay substantial restitution to W.W.H.

245.     Further discovery will be required to quantify Defendants' unjust enrichment and an appropriate amount of restitution for W.W.H.

### THIRD CAUSE OF ACTION
*False Endorsement - Lanham Act, 15 U.S.C. § 1125(a)*
*(Against All Defendants)*

246.     Plaintiff repeats and realleges the foregoing paragraphs.

247.     Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a), provides that "[a]ny person who, on or in connection with any goods or services . . . uses in commerce any . . . name . . . or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion, or cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin,

69

sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act."

248.    W.W.H. is a widely recognizable celebrity.

249.    In connection with the Program, Defendants have made false and misleading representations of fact suggesting that W.W.H. executive produced, agreed to, and approved of the Program and its depiction of her.  In reality, W.W.H. did not do any of those things; nor was she compensated for them.  Due to her FTD and PPA, W.W.H. lacked the capacity to consent to, much less executive produce, the Program.  And far from "approving" or endorsing the Program, W.W.H. was not even shown the Program prior to its public release.  Nor would W.W.H., or anyone with her best interests in mind, have approved the exploitative Program.

250.    Defendants' misrepresentations were made in commerce and in connection with goods or services.  Specifically, Defendants' misrepresentations were made in the context of promoting the Program and convincing viewers to watch the Program, thereby creating substantial revenue for Defendants, including substantial advertising revenue for Defendant Lifetime, and increasing Lifetime's viewership numbers and subscribers.

251.    Defendants' misrepresentations were highly likely to, and did, cause confusion as to the origin, sponsorship, or approval of the goods or services.  By falsely promoting the Program as a program agreed to, approved by, and executive produced by W.W.H., Defendants gave the false impression that she sponsored, endorsed, or approved of the Program.  Defendants continued to promote this false narrative even after the Guardian sought to enjoin the release of the Program on the ground that W.W.H. did not consent to, and does not approve or endorse, the Program.

Case 1:24-cv-07856-RA    Document 1-10    Filed 10/16/24    Page 72 of 76

252.    It is harmful to W.W.H.'s reputation for the public and the entertainment industry to believe, as Defendants allege, that W.W.H. would executive produce, approve, and authorize for release such a demeaning depiction of herself.

253.    Defendants' false suggestions that W.W.H. executive produced and approved of the Program significantly increased viewership, and thus Defendants' profits, for the Program. Absent Defendants' false statements that W.W.H. supported and executive produced the Program, viewership numbers and Defendants' profits would have been much lower.

254.    The Program is exploitative.  By falsely claiming that W.W.H. had executive produced and approved of the Program, Defendants sought to avoid the ethical questions and public backlash and to increase viewership by convincing fans that W.W.H. wanted people to watch the Program.

255.    As a result of Defendants' misrepresentations, W.W.H. has suffered substantial damages in the form of irreparable harm to her reputation and earnings potential.

256.    W.W.H. is entitled to an injunction restraining Defendants from further unauthorized use of her name, portrait or picture, and voice, including but not limited to the Program and any related footage.

257.    Pursuant to Section 43(a)(1)(A) of the Lanham and principles of equity, Defendants should be required to disgorge any proceeds received in connection with the Program, and W.W.H. is further entitled to an award of damages sustained and an award for attorneys' fees and costs in bringing this action.

## **FOURTH CAUSE OF ACTION**
### *Fraud*
### *(Against All Defendants)*

258.    Plaintiff repeats and realleges the foregoing paragraphs.

71

Case 1:24-cv-07856-RA    Document 1-10    Filed 10/16/24    Page 73 of 76

259.    Defendants, through agents and third parties at the times identified above, represented to the Guardian and W.W.H.'s attorneys that the Program would showcase W.W.H.'s "comeback" and portray W.W.H. in a favorable and respectful light, and would avoid any negative implications or scenes that cast W.W.H. in a damaging light.

260.    Defendants, through agents and third parties at the times identified above, represented that no footage of W.W.H. would be used, publicized, or exploited until after the Guardian had approved amendments to the Contract.

261.    Defendants' representations were false.  The Program did not showcase a "comeback" and did not depict W.W.H. in a positive light.  To the contrary, the Program portrayed W.W.H. as a laughingstock and a drunkard.  Defendants publicized and exploited the footage of W.W.H. without the Guardian's approval of the Contract and any amendment.

262.    Defendants knew that their representations were false at the time they were made.

263.    Defendants intended that the representations made by them to W.W.H.'s attorneys would be communicated to the Guardian.

264.    Defendant made the false representations intending that the Guardian, on behalf of W.W.H., would rely upon them and not stop the filming or otherwise act to prevent the release of the Program.

265.    The Guardian, on behalf of W.W.H., reasonably relied upon Defendants' representations and would not have permitted W.W.H. to be filmed had she known of Defendants' true intentions and how W.W.H. would be portrayed.

266.    Defendants' release of the Program has caused W.W.H. to suffer injury, loss, and damage due to the embarrassing, harmful, degrading, and untruthful depictions in the Program and its use of footage of W.W.H. while patently impaired and incapacitated.  W.W.H. has suffered

72

harm to her reputation, legacy, and her remaining future earning potential. W.W.H. has also suffered harm in the form of damaging, intrusive, and unwarranted publicity, which will only impact her negatively and jeopardize her privacy, health, and safety. W.W.H. has also been harmed by Defendants' intrusion upon her home and her private life under false pretenses, all while W.W.H. was acutely vulnerable and susceptible to harm on account of her FTD and PPA.

267. The Guardian's reliance, on behalf of W.W.H., on Defendants' false representations was a substantial factor in causing W.W.H.'s harm.

## **PRAYER FOR RELIEF**

Plaintiff Sabrina E. Morrissey, Esq., acting in her capacity as Guardian for W.W.H., respectfully requests the following relief:

a. a declaration that the Contract is null, void, and of no effect;

b. an award of compensatory damages in favor of W.W.H.;

c. an award of punitive damages in favor of W.W.H.;

d. an order requiring Defendants to disgorge, and pay to W.W.H., all proceeds received in connection with the Program;

e. an injunction pursuant to 15 U.S.C. §§ 1116, 1125 permanently enjoining Defendants from any further airing, sales, or release of the Program and any associated footage depicting W.W.H., and from any further statements suggesting that W.W.H. executive produced, approved, or endorses the Program;

f. an award of attorneys' fees and costs; and

g. such other and further relief as the court deems just and proper.

73

Dated: September 16, 2024
   New York, New York

**KAPLAN MARTIN LLP**

By: _____

Roberta A. Kaplan
Timothy S. Martin
Maximilian T. Crema
156 West 56th Street, Suite 207
New York, New York 10019
Tel.: (212) 316-9500
Email: rkaplan@kaplanmartin.com
Email: tmartin@kaplanmartin.com
Email: mcrema@kaplanmartin.com

**CADWALADER, WICKERSHAM & TAFT LLP**

By: _____

Ellen V. Holloman
Amanda L. Devereux
200 Liberty Street
New York, New York 10281
Tel.: (212) 504-6000
Email: ellen.holloman@cwt.com
Email: amanda.devereux@cwt.com

*Attorneys for Sabrina E. Morrissey, acting
in her capacity as Guardian for W.W.H.*

74

Case 1:24-cv-07856-RA Document 1-10 Filed 10/16/24 Page 76 of 76

# **VERIFICATION**

STATE OF NEW YORK )
                     ) ss.:
COUNTY OF NEW YORK )

Sabrina E. Morrissey, being duly sworn, deposes and says:

Deponent is the Plaintiff in the within action; the contents thereof are true to deponent's

own knowledge, except as to the conduct of others, which are stated to be alleged on information

and belief, and that as to these matters, deponent believes it to be true.

_____
Sabrina E. Morrissey

Sworn to before me this 16TH day of
September, 2024

_____
Notary Public

Maria Teresa Raigosa
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01RA6428906
Qualified in Queens County
Commission Expires 01/31/2026

75