November 12, 2024

**VIA ECF**

The Honorable Ronnie Abrams
United States District Judge
Southern District of New York
40 Foley Square, Room 2203
New York, New York 10007

   Re: *Morrissey v. A&E Television Networks, LLC, et al.*, No. 24 Civ. 7856 (S.D.N.Y.)

Dear Judge Abrams:

  We write jointly on behalf of the parties in the above-referenced action. Pursuant to Your Honor's October 22, 2024 Order (ECF 14), we hereby submit this joint letter and a proposed case management plan and scheduling order on behalf of all parties.

**1. A brief description of the nature of the action and the principal defenses thereto.**

 *A. Plaintiff's Claims*

  This case is brought by Sabrina E. Morrissey, acting in her capacity as court-appointed Guardian (the "Guardian") to W.W.H., an acclaimed African-American entertainer who, tragically, suffers from dementia and, as a result, has become cognitively impaired, permanently disabled, and incapacitated.[1] Defendants are powerful media companies and a producer who deliberately and cruelly took advantage of W.W.H.'s cognitive and physical decline by creating and publishing a "documentary" (the "Program"), at a time when W.W.H. was highly vulnerable and clearly incapable of consenting to be filmed.

  Defendants were fully aware at all relevant times that W.W.H. was incapacitated. As early as 2021, press reports attributed W.W.H.'s increasingly erratic behavior to early-onset dementia and it was widely reported in early 2022 that a temporary guardian had been appointed by a court to manage W.W.H.'s affairs. Defendants nonetheless sought to film and exploit W.W.H.'s cognitive and physical decline in late 2022 and 2023 in the most obscene manner possible for their own financial gain. Even worse, they intentionally manipulated and goaded W.W.H.—who is unable to effectively self-regulate her emotions due to her dementia—to trigger strong emotional reactions and acquire embarassing footage.

  The Program depicts W.W.H. in a humiliating and degrading manner. It opens with W.W.H. stating "*I love vodka!*" after being pressed about alleged alcohol abuse by the Defendants. Shortly thereafter, during the same interview, W.W.H. states she is glad that she can "*show my boobs*" and then pulls down the front of her top, grabs her nipples, and gives the middle finger. The remainder

---

[1] Pursuant to Justice Chan's February 21, 2024 Sealing Order (ECF 1-2), the parties have used "W.W.H." rather than W.W.H.'s true name in filings with the Court.

of the four-hour Program does not improve. As *Variety* wrote in its review, the Program "is not a series about the next chapter of [W.W.H.'s] life but instead an exploitative display of her cognitive decline and emotional well-being."[2]

The Program reportedly attracted over 6 million viewers the weekend of its debut, and ignited a firestorm in the press and on social media, with an overwhelming chorus of media commentators and viewers criticizing Defendants for taking advantage of an obviously incapacitated woman suffering from dementia. Major streaming platforms including Amazon and YouTube have since dropped the Program. Defendants have refused to accept responsibility for their reprehensible conduct and have instead resorted to misrepresentations and half-truths in an effort to shift the blame. They have made false and misleading claims suggesting that W.W.H. executive produced, agreed to, and approved of the Program and its depiction of her. In reality, W.W.H. did not do any of those things. And while Defendants claim to possess a contract authorizing the Program ("Talent Agreement"), the signature on the Talent Agreement looks nothing like W.W.H.'s signature, which is visually distinct, and in all events W.W.H. was incapacitated and unable to consent by reason of her dementia.[3]

Defendants have also sought to blame the Guardian for failing to "protect" W.W.H. from their aggressive exploitation—in effect, faulting the Guardian for their own misconduct. These arguments are baseless. None of the Defendants ever gained the Guardian's consent for W.W.H.'s participation to be filmed, and the Guardian did not learn of the Talent Agreement until March 2023, seven months after the start of filming. What's more, upon discovery of the Talent Agreement, Defendants were promptly informed that W.W.H. was not in a position to have executed the Talent Agreement, and Defendants provided assurances that W.W.H. would be shown in a positive light and that they would not release any footage until the Talent Agreement was renegotiated. As is now apparent, those representations were false and intended to induce the Guardian to not stop the filming of the Program or otherwise act to prevent its release.

Defendants' filming and release of the Program has caused W.W.H. to suffer substantial injury, loss, and damage due to misappropriation of W.W.H.'s labor, the embarrassing, harmful, and degrading nature of the Program, and Defendants' false representations that W.W.H. "executive produced" and actually endorsed the Program. Defendants have made millions on W.W.H.'s back, while W.W.H. has received a paltry $82,000. The Guardian seeks to hold Defendants accountable for their willful exploitation of W.W.H., and brings claims on her behalf for: (1) declaratory judgment that the Talent Agreement is null, void, and of no effect; (2) unjust enrichment; (3) false endorsement under the Lanham Act, 15 U.S.C. § 1125(a); and (4) fraud.

B. *Defendants' Defenses*

---

[2] Aramide Tinubu, 'Where is Wendy Williams?' *Docuseries Is Unsettling and Exploitative*, Variety (Feb. 24, 2024), https://variety.com/2024/tv/reviews/where-is-wendy-williams-review-lifetime-1235920928/.

[3] Although W.W.H. was not formally diagnosed with dementia until after the Program was filmed, the process of reaching a formal diagnosis on average takes more than three years from the disease's onset. ECF 1-10 ¶ 175.

Defendants A&E Television Networks, LLC, Entertainment One Reality Productions, LLC, Lifetime Entertainment Services, LLC, Creature Films, Inc., and Mark Ford (collectively, "Defendants") assert that their defenses are as follows, without waiver of, or prejudice to their ability to raise, other and further defenses:  This case arises from the Guardian's misguided efforts to attempt to excuse her own failure to protect her ward, W.W.H., deflect from her own decision to allow her ward to be filmed without checking in on her at a time the Guardian now says any reasonable person would not have allowed W.W.H. to act independently, and supplant W.W.H.'s wishes with her own.  Plaintiff's attempt to find someone to blame for her own (in)action is unjustified and has no basis in the law.

Specifically, on February 24, 2024, A&E Television Networks, LLC ("AETN"), was set to distribute the four-part documentary *Where is Wendy Williams?* (the "Documentary").  The Documentary was conceived of with W.W.H.'s consent, input, and participation, well before she was diagnosed with any form of dementia and before she had a guardian with any authority over her professional contractual obligations.  The Documentary captures a raw, honest and unfiltered window into the life of W.W.H., a well-known public figure famous for the frank self-exposure of her struggles with physical maladies, addiction, and her husband's infidelity.  It incisively depicts how W.W.H.'s authenticity still shined even as she struggled with her loss of autonomy while under guardianship.  Tellingly for this case, the Documentary exposes how the guardianship system that was purportedly put in place to guard W.W.H.'s interests instead isolated her from her family, left her largely alone and unattended in her apartment, exacerbated her self-destructive behavior and mental decline, and failed to prevent her use and/or abuse of alcohol.

Notwithstanding the many months during which the Guardian was well aware of the production of the Documentary, she waited until four days before the Documentary was set to be released to initiate this action, *ex parte*, against AETN and Entertainment One Reality Productions, LLC ("eOne"), seeking declaratory relief and a permanent injunction preventing AETN and eOne from releasing the Documentary or any associated footage.  The Guardian obtained and then served AETN and eOne with an *ex parte* temporary restraining order ("TRO") enjoining publication of the Documentary.  Within 24 hours of service, the TRO was vacated by Justice Peter Moulton of the New York Appellate Division First Department as an unconstitutional prior restraint.  The Guardian did not serve the original Complaint, however, until June 13, 2024, eight days before her time for service would run.  Plaintiff then sought three separate extensions to file an Amended Complaint, to which Defendants consented in each instance.

Finally, on September 16, 2024, the Guardian filed her operative Amended Complaint, asserting claims for false endorsement under the Lanham Act, 15 U.S.C. § 1125(a), as well as state law claims for a declaratory judgment, unjust enrichment, and fraud (the "Amended Complaint").

The core of the Guardian's claim is that the On-Camera Talent Agreement executed by W.W.H. (the "Talent Agreement")—which otherwise bars the claims asserted in this action—is void, either because W.W.H. was incapacitated at the time it was signed, or did not sign it at all.  However, the Guardian fails to mention in her Amended Complaint that W.W.H. was at all times

3

enthusiastic about the project, that her Talent Agreement was negotiated by multiple attorneys for W.W.H., that the Guardian herself was aware of the Talent Agreement during these negotiations, and that the Guardian nevertheless took no step to stop the Talent Agreement from being executed. Moreover, the Talent Agreement was executed before the Guardian ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮, and the Documentary was completed *before* she was formally diagnosed with dementia ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Additionally, the Amended Complaint itself alleges that the Guardian was ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, yet she never sought to ▮▮▮▮ the Talent Agreement and allowed the project to proceed. Finally, and importantly, though the Amended Complaint claims W.W.H.'s signature on the Talent Agreement is visually distinct from her "real" signature, the Guardian's own pleadings include an example of W.W.H.'s signature that closely *matches* the one on the Talent Agreement. *Compare* ECF 1-13 at 7 to ECF 1-14 at 11. The Guardian's claims are thus not only meritless, they are facially misleading.

In short, the facts do not support the Guardian's claims, but instead paint a clear picture of the Guardian assenting to W.W.H.'s participation in the Documentary and affirming her capacity to participate in it, and only attempting to withdraw that assent and affirmation after the Documentary was complete and she decided she did not like its contents. Plaintiff will not be able to support the elements of her claims, and Defendants have numerous defenses including, but not limited to, that the claims are barred by W.W.H.'s Talent Agreement, that W.W.H. was adequately (indeed, generously) compensated and paid the full $400,000 due under her Talent Agreement, and that the claims are barred by the First Amendment and numerous equitable doctrines. Finally, Defendants have an affirmative counterclaim for costs and fees incurred in the defense of a meritless claim arising from protected speech—namely, the publication of the Documentary—under New York's anti-SLAPP law.

**2.  A brief explanation of why jurisdiction and venue lie in this Court.**

This Court has subject matter jurisdiction over this action because Plaintiff's Amended Complaint asserts a cause of action against Defendants under the federal Lanham Act, 15 U.S.C. §§ 1125(a), *et seq*. Accordingly, Plaintiff's claims against Defendants are within the Court's original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338. Plaintiff's state law claims in this action arise out of the same case or controversy as the claims arising under federal law. Specifically, all of the claims in the Amended Complaint center on whether W.W.H. had authority to consent to the Documentary and act as its executive producer. Specifically, the Lanham Act claim and state law claims for a declaratory judgment, unjust enrichment, and fraud all arise out of the same common nucleus of operative facts. *See Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.,* 373 F.3d 296, 308 (2d Cir. 2004). Accordingly, there is supplemental jurisdiction over all other claims in this action.

This Court has personal jurisdiction over Plaintiff because, as alleged in the Amended Complaint, she "is the court appointed Guardian for W.W.H. pursuant to Article 81 of the Mental Hygiene Law" and "W.W.H. is a resident of New York and subject to a guardianship in New York."

ECF 1-10 at ¶ 62.  This Court has personal jurisdiction over the Defendants because each has voluntarily submitted to jurisdiction in the Southern District of New York by removing this action.

Venue for this action properly lies in this district court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred in this district.

3. **A brief description of all contemplated and/or outstanding motions.**

There are presently no outstanding motions before the Court.

Plaintiff will evaluate whether a motion pursuant to Fed. R. Civ. P. 12 is warranted after receiving Defendants' anticipated answers with counterclaims.

Defendants are evaluating whether a motion pursuant to Fed. R. Civ. P. 12(c) is warranted with respect to some or all of Plaintiff's claims.  Should the case not be resolved through a Rule 12 motion, Defendants anticipate filing a motion for summary judgment pursuant to Fed. R. Civ. P. 56.

4. **A brief description of any discovery that has already taken place, and/or that which will be necessary for the parties to engage in meaningful settlement negotiations.**

No discovery has taken place.  The parties do not anticipate that a period of limited, preliminary discovery will meaningfully advance settlement negotiations.

5. **A brief description of prior settlement discussions (without disclosing the parties' offers or settlement positions) and the prospect of settlement.**

<u>Plaintiff's Position</u>: Prior to filing the Amended Complaint, counsel for Plaintiff reached out to counsel for Defendants to discuss settlement.  Without disclosing Defendants' precise position, counsel for Plaintiff notes that, in their view, Defendants' response did not constitute anything approaching a meaningful, good faith engagement in settlement discussions.

<u>Defendants' Position</u>: The parties met to discuss settlement prior to filing the Amended Complaint.  These discussions were not fruitful.

6. **The estimated length of trial.**

The parties anticipate that trial will last approximately two to four weeks.

7. **Any other information that the parties believe may assist the Court in advancing the case to settlement or trial, including, but not limited to, a description of any dispositive issue or novel issue raised by the case.**

N/a.

November 12, 2024                                             Respectfully submitted,

| /s/ Roberta A. Kaplan | /s/ Rachel F. Strom |
|---|---|
| Roberta A. Kaplan | Rachel F. Strom |
| Timothy S. Martin | Abigail B. Everdell |
| Christopher R. Le Coney | Alexandra M. Settelmayer |
| Maximilian T. Crema | DAVIS WRIGHT TREMAINE LLP |
| KAPLAN MARTIN LLP | 1251 Avenue of the Americas |
| 156 West 56th Street, Suite 207 | New York, New York 10020 |
| New York, New York 10019 | Tel: (212) 489-8230 |
| Tel.: (212) 316-9500 | Fax: (212) 489-8340 |
| rkaplan@kaplanmartin.com | rachelstrom@dwt.com |
| tmartin@kaplanmartin.com | abigaileverdell@dwt.com |
| cleconey@kaplanmartin.com | alexandrasettelmayer@dwt.com |
| mcrema@kaplanmartin.com | |
| | *Counsel for Defendants* |
| Ellen V. Holloman | |
| Amanda L. Devereux | |
| CADWALADER, WICKERSHAM & TAFT LLP | |
| 200 Liberty Street | |
| New York, New York 10281 | |
| Tel: (212) 504-6200 | |
| ellen.holloman@cwt.com | |
| amanda.devereux@cwt.com | |
| | |
| *Counsel for Plaintiff* | |

cc:    Counsel of record (via ECF)