## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

SABRINA E. MORRISSEY, *acting in her capacity as Guardian of W.W.H.*,

        *Plaintiff,*

    -against-

A&E TELEVISION NETWORKS, LLC;
ENTERTAINMENT ONE REALITY
PRODUCTIONS, LLC; LIFETIME
ENTERTAINMENT SERVICES, LLC;
CREATURE FILMS, INC.; and MARK FORD,

        *Defendants.*

Case No. 1:24 Civ. 7856 (RA)

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF SABRINA E. MORRISSEY'S MOTION TO DISMISS DEFENDANTS' ANTI-SLAPP COUNTERCLAIMS

Roberta A. Kaplan
Timothy S. Martin
Christopher R. Le Coney
Tasha N. Thompson
Maximilian T. Crema
KAPLAN MARTIN LLP
1133 Avenue of the Americas, Suite 1500
New York, New York 10036
(212) 316-9500

December 20, 2024

## TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ........................................................................................... ii

PRELIMINARY STATEMENT ..................................................................................... 1

BACKGROUND .............................................................................................................. 5

    A.    W.W.H.'s Tragic and Widely Publicized Cognitive and Physical Decline........... 5

    B.    The Filming of the Program........................................................................ 6

    C.    The Release of The Program....................................................................... 7

    D.    Proceedings Before This Court.................................................................... 9

ARGUMENT ................................................................................................................... 10

I.    DEFENDANTS' COUNTERCLAIMS MUST BE DISMISSED BECAUSE THEY DID NOT OBTAIN PERMISSION TO SUE THE GUARDIAN ................................. 11

II.    NEW YORK'S ANTI-SLAPP STATUTE DOES NOT APPLY IN FEDERAL COURT ......................................................................................................... 14

III.    DEFENDANTS FAIL TO STATE A CLAIM UNDER N.Y. C.R.L. § 70-A ................. 20

    A.    N.Y. C.R.L. § 70-a Does Not Apply to the Guardian's Lanham Act, Declaratory Judgment, and Fraud Claims.............................................. 20

    B.    The Guardian's Claims Have a Substantial Basis in Law and Fact..................... 22

    C.    Defendants Do Not Plead Entitlement to Compensatory and Punitive Damages.............................................................................................. 25

CONCLUSION............................................................................................................... 25

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*A.V.E.L.A., Inc. v. Est. of Marilyn Monroe, LLC*,
   131 F. Supp. 3d 196 (S.D.N.Y. 2015)...................................................................... 10

*Abzug v. Lieberman*,
   2024 WL 4604789 (N.Y. Sup. Ct. 2024)............................................................... 2, 21

*Adelson v. Harris*,
   774 F.3d 803 (2d Cir. 2014)................................................................................ 14, 19

*Adelson v. Harris*,
   973 F. Supp. 2d 467 (S.D.N.Y. 2013)................................................................. 17, 19

*AM Gen. LLC v. Activision Blizzard, Inc.*,
   450 F. Supp. 3d 467 (S.D.N.Y. 2020)....................................................................... 24

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)............................................................................................ 10, 15

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) .................................................................................................. 15

*Blatt v. Manhattan Med. Grp.*,
   131 A.D.2d 48 (N.Y. 1st Dep't 1987)....................................................................... 21

*Bobulinski et al. v. Tarlov*,
   2024 WL 4893277 (S.D.N.Y. 2024)........................................................... 17, 18, 19

*Brady v. NYP Holdings, Inc.*,
   2022 WL 992631 (S.D.N.Y. 2022)...................................................................... 16, 17

*Bull. Displays, LLC v. Regency Outdoor Advert., Inc.*,
   448 F. Supp. 2d 1172 (C.D. Cal. 2006) .................................................................... 20

*Carbone v. Cable News Network*,
   910 F.3d 1345 (11th Cir. 2018) ................................................................................ 19

*Carroll v. Trump*,
   590 F. Supp. 3d 575 (S.D.N.Y. 2022)......................................................... 15, 17, 20

*CDC Newburgh Inc. v. STM Bags, LLC*,
   692 F. Supp. 3d 205 (S.D.N.Y. 2023)....................................................................... 16

*Cliffs Notes, Inc. v. Bantam Doubleday Dell Pub. Grp.*,
    886 F.2d 490 (2d Cir. 1989) ................................................................................... 24

*Concerned Citizens of Forest Hills Inc. v. W. Side Tennis Club*,
    215 N.Y.S.3d 762 (N.Y. Sup. Ct. 2024) .................................................................. 22

*In re Cumberbatch*,
    657 B.R. 683 (Bankr. E.D.N.Y. 2024) ............................................................... 12, 13

*Douglas v. N.Y. State Adirondack Park Agency*,
    895 F. Supp. 2d 321 (N.D.N.Y. 2012) ..................................................................... 21

*Epstein v. Perl*,
    110 N.Y.S.3d 508 (N.Y. Sup. Ct. 2018) .................................................................. 12

*Exec. Park Partners LLC v. Benicci Inc.*,
    2023 WL 3739093 (S.D.N.Y. 2023) ......................................................................... 16

*Friedman v. Bloomberg, L.P.*,
    2022 WL 1004578 (D. Conn. 2022) ......................................................................... 16

*Friedman v. Friedman*,
    2021 WL 3682270 (S.D.N.Y. 2021) ......................................................................... 13

*Galanova v. Portnoy*,
    432 F. Supp. 3d 433 (S.D.N.Y. 2020) ...................................................................... 13

*Gallop v. Cheney*,
    642 F.3d 364 (2d Cir. 2011) ...................................................................................... 25

*Ginx, Inc. v. Soho All.*,
    720 F. Supp. 2d 342 (S.D.N.Y. 2010) ............................................................. 4, 16, 20

*Gitzis v. Nozhnik*,
    2020 WL 1989285 (E.D.N.Y. 2020) ........................................................................ 13

*Kesner v. Buhl*,
    590 F. Supp. 3d 680 (S.D.N.Y. 2022) ................................................................ 15, 18

*La Liberte v. Reid*,
    966 F.3d 79 (2d Cir. 2020) ................................................................................. *passim*

*LaNasa v. Stiene*,
    731 F. Supp. 3d 403 (E.D.N.Y. 2024) ..................................................................... 16

*Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*,
   507 U.S. 163 (1993) ........................................................................................................ 15

*In re Linden-Rath*,
   729 N.Y.S.2d 265 (N.Y. Sup. Ct. 2001) ........................................................... 12, 13

*LoanStreet, Inc. v. Troia*,
   2023 WL 5836237 (S.D.N.Y. 2023) ......................................................................... 16

*Makarova v. United States*,
   201 F.3d 110 (2d Cir. 2000) ........................................................................................ 10

*Maron v. Legal Aid Soc'y*,
   605 F. Supp. 3d 547 (S.D.N.Y. 2022) ................................................................... 16

*Max v. Lissner*,
   2023 WL 2346365 (S.D.N.Y. 2023) ........................................................ 17, 18, 23

*McIntire v. China MediaExpress Holdings, Inc.*,
   113 F. Supp. 3d 769 (S.D.N.Y. 2015) ................................................................. 12, 13

*Nat'l Acad. of Television Arts & Scis., Inc. v. Multimedia Sys. Design, Inc.*,
   551 F. Supp. 3d 408 (S.D.N.Y. 2021) ................................................................. 15, 17

*Oliva v. Town of Greece*,
   630 F. App'x 43 (2d Cir. 2015) ................................................................................ 25

*Prince v. Intercept*,
   634 F. Supp. 3d 114 (S.D.N.Y. 2022) ................................................................... 16

*Ramiro Aviles v. S & P Glob., Inc.*,
   380 F. Supp. 3d 221 (S.D.N.Y. 2019) ................................................................... 21

*Reeves v. Associated Newspapers, Ltd.*,
   232 A.D.3d 10 (N.Y. 1st Dep't 2024) ................................................................... 14

*Rogers v. Grimaldi*,
   875 F.2d 994 (2d Cir. 1989) ........................................................................................ 24

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
   559 U.S. 393 (2010) ........................................................................................... 15, 18

*Terry v. County of Suffolk*,
   654 F. App'x 5 (2d Cir. 2016) ........................................................................ 3, 11, 13

*Trump v. Trump*,
 227 A.D.3d 635 (N.Y. 1st Dep't 2024) ................................................................... 21

*Tucker v. All Metro Home Care Services, Inc*
 2022 WL 17269441 (N.Y. Sup. Ct. 2022) ............................................................... 12

*Wright v. Rickards*,
 94 A.D.3d 874 (N.Y. 2d Dep't 2012) ...................................................................... 3, 11

**Statutes & Rules**

15 U.S.C. § 1125(a) ................................................................................................ *passim*
Federal Rule of Civil Procedure 11 ........................................................................ 17
Federal Rule of Civil Procedure 12 ........................................................................ *passim*
Federal Rule of Civil Procedure 56 ........................................................................ *passim*
New York Civil Rights Law § 70-a ........................................................................ *passim*
New York Civil Rights Law § 76-a ........................................................................ 1, 9, 21
New York Civil Practice Law and Rules § 3211(g) ............................................... 9, 19
New York Civil Practice Law and Rules § 3212(h) ............................................... 9, 19

**Other Authorities**

Aramide Tinubu, '*Where is Wendy Williams?' Docuseries Is Unsettling and Exploitative: TV
 Review*, Variety (Feb. 24, 2024), https://variety.com/2024/tv/reviews/where-is-wendy-
 williams-review-lifetime-1235920928/ ................................................................... 8

Lacey Rose, *Inside the Final Days of* The Wendy Williams Show, Hollywood Reporter
 (Aug. 17, 2022) ...................................................................................................... 23

Maureen Callahan, *TV's Ghoulish New Low: Dementia-Hit Wendy Williams is Reduced to a
 Sideshow Freak as Relatives Crawl into her Fading Spotlight*, Daily Mail (Feb. 23, 2024),
 https://www.dailymail.co.uk/tvshowbiz/article-13116139/Wendy-Williams-dementia-
 documentary.html .................................................................................................. 8

Plaintiff Sabrina E. Morrissey, acting in her capacity as the court-appointed guardian for W.W.H. (the "Guardian"), respectfully submits this memorandum of law in support of her motion to dismiss counterclaims brought by Defendants A&E Television Networks, LLC ("A&E"); Entertainment One Reality Productions, LLC ("eOne"); Lifetime Entertainment Services, LLC ("Lifetime"); Creature Films, Inc. ("Creature Films"); and Mark Ford (collectively, "Defendants") seeking to recover damages and attorneys' fees under New York's Anti-Strategic Lawsuits Against Public Participation Law ("anti-SLAPP") codified at New York Civil Rights Law §§ 70-a and 76-a (the "Counterclaims"). *See* ECF 27 ("A&E Ans. & CC"); ECF 29 ("eOne Ans. & CC"); ECF 31 ("Creature Ans. & CC").

## PRELIMINARY STATEMENT

Abusing a woman who is struggling with dementia is not protected by the First Amendment. This case is not about free speech and public participation; it is about Defendants' deliberate and depraved exploitation of W.W.H., an acclaimed television entertainer mentally incapacitated by dementia who has been under a legal guardianship since 2022. Defendants—major media companies and a prominent producer—cruelly took advantage of W.W.H.'s cognitive decline to line their own pockets by creating and selling a so-called "documentary" (the "Program") at a time when W.W.H. was highly vulnerable and incapable of consenting to be filmed.

W.W.H. suffers from frontotemporal dementia, a degenerative disease of the brain that has no cure. The disease has caused a steady decline in W.W.H.'s ability to think and function, rendering her mentally incapacitated. Despite being fully aware that W.W.H. was in no condition to consent, Defendants filmed and exploited W.W.H.'s cognitive decline in the most obscene manner possible. As one critic aptly put it, the Program "did the very thing it purports to be exposing—exploiting a declining star and turning her pain into profit." Am. Compl. ¶ 52.

Faced with a firestorm of public outrage over their release of the Program, Defendants refused to take responsibility. Instead, they resorted to falsehoods, claiming their actions were allowed under a Talent Agreement that W.W.H. purportedly signed despite her obvious mental incapacity to consent. Defendants also brazenly and falsely insisted that W.W.H. approved and even "executive produced" the Program. In reality, W.W.H. never even saw the Program before it aired, let alone "executive produced" it. Additionally, at the time the Talent Agreement was supposedly signed by W.W.H., it was well known that she was under legal guardianship, yet Defendants never obtained the Guardian's signature or ratification of the Talent Agreement. Instead, Defendants actively and consistently misrepresented their intentions in filming the Program to keep the Guardian from intervening in the Program's production or release. Defendants have made millions from their exploitation of W.W.H., while she has suffered immense harm, humiliation, and reputational damage.

The Guardian brought this suit to hold Defendants accountable for their reprehensible misconduct, asserting claims on W.W.H.'s behalf for: (1) a declaratory judgment that the Talent Agreement is null, void, and of no effect; (2) unjust enrichment based on Defendants' unlawful profiting from W.W.H.'s participation in the Program; (3) false endorsement under the Lanham Act, 15 U.S.C. § 1125(a), based on Defendants' knowing misrepresentation that W.W.H. approved, endorsed, and "executive produced" the Program; and (4) fraud, arising from Defendants' false assurances about their intentions for the Program and their misrepresentations to the Guardian.

Rather than challenge the sufficiency of the Guardian's claims through a motion to dismiss, Defendants answered and filed counterclaims under New York's anti-SLAPP statute, seeking not only attorneys' fees, but compensatory and punitive damages as well, on the baseless assertion that the Guardian's claims were intended to suppress Defendants' free speech. But "not every suit that involves a motion picture or documentary is a SLAPP suit," *Abzug v. Lieberman*, 2024 WL

4604789, at *3 (N.Y. Sup. Ct. Oct. 29, 2024), and Defendants cannot hide behind the First Amendment to evade liability for their fraudulent and exploitative actions simply because they filmed and broadcast their gross misconduct for all the world to see.

Defendants' Counterclaims are both procedurally and substantively deficient. As explained below, the Court should dismiss the Counterclaims because they do not comply with New York law, are preempted by the Federal Rules of Civil Procedure, and fail to allege the factual basis necessary to state their claims under New York's anti-SLAPP statute:

*First*, Defendants failed to obtain the required permission from the Guardianship Court before filing the Counterclaims, depriving this Court of jurisdiction to hear them. Under New York law, "[o]nce a guardian is appointed for an incapacitated person, litigation against the incapacitated person and against the guardian as representative of the incapacitated person should not proceed without the permission of the court which appointed the guardian." *Wright v. Rickards*, 94 A.D.3d 874, 875 (N.Y. 2d Dep't 2012). This requirement ensures that the Guardianship Court's plenary authority to manage the incapacitated individual's affairs is respected and that unauthorized litigation does not interfere with its oversight. Defendants' failure to obtain permission from the Guardianship Court is no mere technicality—it is a jurisdictional defect that requires dismissal. *Terry v. County of Suffolk*, 654 F. App'x 5, 6 (2d Cir. 2016) (holding claims "were properly dismissed because [plaintiff] did not obtain permission to sue [the appointed guardian]").

*Second*, New York's anti-SLAPP statute does not apply in federal court because it conflicts with the Federal Rules of Civil Procedure. The statute imposes a "substantial basis in law and fact" standard that answers the same question addressed by the Federal Rules: what standard governs the viability of claims before trial. As the Second Circuit held in *La Liberte v. Reid*, 966 F.3d 79, 87 (2d Cir. 2020), state laws imposing standards inconsistent with the Federal Rules cannot be applied in federal court. Multiple district courts have applied this reasoning to New York's anti-SLAPP

statute, correctly concluding that it is incompatible with federal procedural requirements because it subjects claims to a higher level of pre-trial scrutiny (including at commencement) that litigants must satisfy in order to avoid liability for attorneys' fees and other damages.

*Third*, even if New York's anti-SLAPP statute could be applied in this forum—which it cannot—Defendants' Counterclaims would still fail. As a threshold matter, the statute does not apply to federal claims like the Guardian's Lanham Act cause of action. *Ginx, Inc. v. Soho All.*, 720 F. Supp. 2d 342, 366 (S.D.N.Y. 2010) ("[F]ederal courts have declined to apply anti-SLAPP statutes to federal claims."). It also does not apply to the Guardian's declaratory judgment and fraud claims, which concern private contractual matters and nonpublic conduct that occurred long before the Program was broadcast. Only the unjust enrichment claim, which seeks disgorgement of the profits that Defendants obtained through their unlawful exploitation of W.W.H., even arguably falls within the statute's scope.

Defendants' counterclaims must also be dismissed for failure to state a claim under Rule 12(b)(6) for failure to state a claim. To invoke New York's anti-SLAPP statute's entitlement to attorneys' fees, Defendants needed to plausibly allege that the Guardian's allegations have no "substantial basis in law or fact," and to recover compensatory damages and punitive damages, they needed to sufficiently allege that the Guardian filed suit for the "sole" purpose of harassing or maliciously inhibiting Defendants' free speech. Defendants' threadbare allegations fall far short on all counts. Their assertion that the Guardian's claims lack a substantial basis in fact rest on conclusory assertions about the validity of the Talent Agreement and the Guardian's motives. Tellingly, they ignore extensive publicly reported evidence of W.W.H.'s incapacity that the Guardian detailed in her Amended Complaint, as well *as their own admissions* that (i) W.W.H.'s son informed them during filming that she suffers from dementia, A&E Ans. ¶ 42; eOne Ans. ¶ 42; Creature Ans. ¶ 42; and (ii) W.W.H.'s representative informed them in March 2023 that the

Guardian and W.W.H.'s lawyers disputed the Talent Agreement's validity, eOne Ans. ¶ 159. Their conclusory assertions regarding the Guardian's motives are similarly unsupported by any factual allegations of specific acts or statements made by the Guardian that would suggest an improper motive. In short, nothing in their pleading comes close to plausibly alleging that the Guardian's claims lack a "substantial basis" in law or fact, much less that she acted maliciously and for the sole purpose of inhibiting Defendants' speech.

Finally, Defendants' perfunctory First Amendment challenge to the Guardian's Lanham Act claim is meritless. The Constitution does not protect knowingly false commercial endorsement claims. Defendants admit that they did not show the Program or its promotional materials to W.W.H. before broadcast, making it impossible for her to have approved or endorsed it.

For these reasons, Defendants' Counterclaims are barred by state law, preempted by federal law, and fail on the merits. The Court should dismiss the Counterclaims in their entirety.

## BACKGROUND

This case is brought by Sabrina E. Morrissey, acting in her capacity as court-appointed Guardian to W.W.H., an acclaimed entertainer and well-known public figure. Amended Complaint, ECF 25-2 ("Am. Compl.") ¶ 3. The Guardian filed suit against Defendants A&E and eOne on February 22, 2024 in New York Supreme Court, New York County, alleging that Defendants had exploited W.W.H. by filming humiliating and degrading footage of her while she was incapacitated by dementia. ECF 1-5. On September 16, 2024, the Guardian filed her Verified Amended Complaint, adding Defendants Lifetime, Creature, and Mark Ford.

### A.    W.W.H.'s Tragic and Widely Publicized Cognitive and Physical Decline

For many years, W.W.H. solo hosted and executive produced one of the most-watched daily television shows in the United States. Am. Compl. ¶ 3. As early as 2019, W.W.H. began to exhibit increasingly erratic behavior and indicia of cognitive decline, and members of her family were

reportedly told by treating healthcare professionals that W.W.H. was suffering from brain damage. *Id.* ¶¶ 80-90. By fall 2021, W.W.H. was no longer able to appear on her long-running talk show due to her cognitive impairment and continuing decline, and guests host began to fill in for her. *Id.* ¶ 90. Rumors swirled in the press that W.W.H. was suffering from early onset dementia. *Id.* ¶ 86. Tragically, those rumors turned out to be correct. Physicians at Weill Cornell Medical Center diagnosed W.W.H. with frontotemporal lobe dementia ("FTD") and primary progressive aphasia ("PPA"), together referred to herein as "dementia"), which is associated with changes in behavior, personality, language, executive functioning (including decision-making and judgment), and impulse control. *Id.* ¶¶ 10, 173-74.[1] The disease is progressive and incapacitating. *Id.* ¶ 173.

W.W.H.'s television show was cancelled in February 2022 after it became clear she would be unable to return to television. *Id.* ¶ 132. According to the show's producers, W.W.H. had trouble recalling that her show had been cancelled, even after the decision had been announced publicly; each time she was told, W.W.H. "appeared to be having the discussion for the first time." *Id.* ¶ 133. That same month, it was widely reported that the Guardian had been appointed by the New York State Supreme Court to manage W.W.H.'s personal and financial affairs. *Id.* ¶¶ 107-09.

**B.    The Filming of the Program**

Beginning in and around August 2022, Defendants obtained access to W.W.H. through Will Selby, a jeweler by trade, who befriended W.W.H. and began holding himself out as her manager. *Id.* ¶¶ 136, 142. Footage of W.W.H. obtained by Defendants during this period, and later broadcast publicly, is difficult to watch and confirms that W.W.H. was incapable of providing consent for anything, much less for being filmed. W.W.H. is dressed in a startlingly revealing outfit, has difficulty with language, and rapidly fluctuates between extreme agitation, impatience, anger, and

---

[1] Although W.W.H. received this diagnosis in May 2023, *id.* ¶ 173, the process of reaching a formal FTD diagnosis on average takes more than three years from the disease's onset, *id.* ¶ 175.

sobbing. *Id.* ¶¶ 203-205. At one point, W.W.H. states that she is glad to be free of her much-loved talk show so that she can "show my boobs," and then pulls down the front of her top, grabs her nipples, and gives the middle finger. *Id.* ¶ 203. Shortly after this footage was filmed, W.W.H. was admitted to a wellness facility in New York, and was then transferred to a facility in California for extended treatment and care. *Id.* ¶ 147.

Filming resumed in early 2023 after W.W.H. returned to New York. The Guardian attached to the Amended Complaint an agreement purportedly entered into by W.W.H. on or about January 25, 2023 in connection with the Program (the "Talent Agreement"). ECF 1-14. The Amended Complaint questions whether W.W.H. executed the document and alleges that, in all events, W.W.H. was incapacitated and unable to consent to the Talent Agreement at the time it was allegedly signed. Am. Compl. ¶ 155. The Amended Complaint further alleges that the Guardian was not involved in negotiating and did not authorize the Talent Agreement, and did not learn of the agreement until March 2023. *Id.* ¶ 152. Upon the Guardian's discovery of the Talent Agreement, Defendants were promptly informed that W.W.H. was not able to have executed the document, and Defendants provided assurances that W.W.H. would be shown in a positive light and that they would not release any footage until the agreement was renegotiated. *Id.* ¶¶ 159-163. As is now apparent, those representations were false and intended to induce the Guardian to not stop the filming of the Program or otherwise act to prevent its release. *Id.* ¶¶ 258-267.

### C.    The Release of The Program

On February 2, 2024, without warning to the Guardian or W.W.H., Defendants released a trailer for the Program. *Id.* ¶ 179-80. The trailer makes no reference to W.W.H.'s medical conditions and instead depicts W.W.H. in a humiliating and degrading manner. As reported in the *Los Angeles Times*: "[W.W.H.] is shown inebriated, struggling to stand, tearful and seemingly suffering memory loss—all while insisting to friends and family she is of sound mind." *Id.* ¶ 181.

In response to the trailer, W.W.H.'s care team issued a press release informing the public that W.W.H. had been diagnosed with FTD and PPA. *Id.* ¶ 199.

  In addition to the trailer, Defendants released promotional materials falsely listing W.W.H. as an "Executive Producer" of the program, and have since insisted, also falsely, that W.W.H. endorsed the final product. *Id.* ¶ 191. With the permission of the court overseeing the guardianship proceeding concerning W.W.H. (the "Guardianship Court"), the Guardian initiated this action to protect W.W.H.'s privacy, and obtained an *ex parte* Order to Show Cause temporarily restraining A&E and eOne from releasing the Program. *Id.* ¶ 192. On February 23, 2024, A&E and eOne successfully moved for an order vacating the TRO, and thereafter released the Program. *Id.* ¶ 193.

  The Program's humiliating depiction of W.W.H. reached an audience of millions upon its debut. *Id.* ¶ 202. The negative response to the Program was immediate, with many fans of W.W.H., cultural commentators, and media outlets vehemently criticizing Defendants for their unethical exploitation of a woman who is obviously experiencing severe cognitive and physical decline.[2] As Variety wrote in its review, this "is not a series about the next chapter of [W.W.H.'s] life but instead an exploitative display of her cognitive decline and emotional well-being."[3] Major streaming platforms including Amazon and YouTube have since dropped the Program.  ECF 19 at 2.

  The Amended Complaint asserts claims for: (1) declaratory judgment against Defendants A&E and eOne seeking a declaration that the Talent Agreement is null, void, and of no effect; (2) unjust enrichment against all Defendants on the basis that they were unjustly enriched by the

---

[2] As Maureen Callahan explained in the *Daily Mail*: "It all feels gross.  As anyone who loves someone with dementia knows, their personal dignity is the first thing to go.  To have that stripped so very publicly—when it seems [W.W.H.] doesn't have the cognition to assent—is particularly gruesome." Maureen Callahan, *TV's Ghoulish New Low: Dementia-Hit Wendy Williams is Reduced to a Sideshow Freak as Relatives Crawl into her Fading Spotlight*, Daily Mail (Feb. 23, 2024), https://www.dailymail.co.uk/tvshowbiz/article-13116139/Wendy-Williams-dementia-documentary.html.  Numerous other media outlets agreed.  *See* Am. Compl. ¶ 52.

[3] Aramide Tinubu, '*Where is Wendy Williams?' Docuseries Is Unsettling and Exploitative: TV Review*, Variety (Feb. 24, 2024), https://variety.com/2024/tv/reviews/where-is-wendy-williams-review-lifetime-1235920928/;  Am. Compl. ¶ 206.

Program, which was created by W.W.H. performing labor for which she was not adequately compensated pursuant to an invalid purported contract; (3) false endorsement under the Lanham Act, 15 U.S.C. § 1125(a) against all Defendants on the basis that they falsely represented that W.W.H. sponsored and supported the Program; and (4) fraud against all Defendants on the basis that Defendants made false representations upon which the Guardian relied that the Program would show W.W.H. in a positive light sensitive to her condition and would not be released until the Guardian approved amendments to the contract. Am. Compl. ¶¶ 219-267.

### D.    Proceedings Before This Court

Defendants removed this action to federal court on October 16, 2024. ECF 1. After previously indicating that they would move to dismiss Plaintiff's claims, Defendants elected not to do so. Instead, on November 15, 2024, Defendants filed answers and asserted nearly identical counterclaims against the Guardian under New York's anti-SLAPP statute.

New York's anti-SLAPP statute, codified at N.Y. Civ. Rights Law §§ 70-a and 76-a, with implementing rules codified at New York Civil Practice Law and Rules §§ 3211(g) and 3212(h), provides for fee-shifting if there is a "demonstration" that a plaintiff's claims involve "public petition and participation" and lack a "substantial basis in fact and law." If there is an additional showing that the claims were "commenced or continued for the purpose of harassing, intimidating, punishing or otherwise maliciously inhibiting" free speech rights, a defendant is entitled to additional compensatory and potentially punitive damages. N.Y. C.L.R. § 70-a(1)(b)-(c) (punitive damages require additional showing that such a motive was "sole purpose").

In their respective Counterclaims, which are largely duplicative but range in length from 11 to 14 pages, Defendants perfunctorily allege that the claims set forth in the Guardian's 73-page Amended Complaint lack a "substantial basis in law or fact" and were commenced in bad faith. A&E ¶¶ 53-54; eOne ¶¶ 61-62; Creature ¶¶ 64-65. On that basis, Defendants seek recovery of

attorneys' fees, compensatory damages, and punitive damages. A&E CC ¶¶ 53-54; eOne CC ¶¶ 61-62; Creature CC ¶¶ 64-65. The Counterclaims hinge on three thinly-pled assertions: (1) that the Talent Agreement was valid—either because it was executed by W.W.H. or later ratified by the Guardian—and thus bars the Guardian's claims; (2) that the Guardian brought this suit with improper motives; and (3) that the Lanham Act claim violates the First Amendment. A&E CC ¶¶ 14, 38-40, 50; eOne CC ¶¶ 14, 46-48, 58; Creature CC ¶¶ 14, 49-51, 61.

## ARGUMENT

The Guardian respectfully moves for dismissal of Defendants' counterclaims pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction and Rule 12(b)(6) for failure to state a claim. To defeat a motion to dismiss pursuant to 12(b)(1), the claimant (here, Defendants) bears the burden of proving that they have adequately alleged facts that, if true, establish the court's jurisdiction. *See Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) ("A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists."). And the Guardian's "motion to dismiss [Defendants'] counterclaim[s] for failure to state a claim is evaluated using the same standard as a motion to dismiss a complaint." *A.V.E.L.A., Inc. v. Est. of Marilyn Monroe, LLC*, 131 F. Supp. 3d 196, 203 (S.D.N.Y. 2015). To survive such a motion, the pleading must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," and must do more than present "threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Id.* at 204 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted)).

As set forth below, Defendants' Counterclaims must be dismissed for three reasons. *First*, this Court lacks jurisdiction over the Counterclaims because Defendants did not seek the required leave from the Guardianship Court before asserting claims against the Guardian. *Second*, New York's anti-SLAPP statute does not apply in federal court because it is preempted by the Federal

10

Rules of Civil Procedure. *Third*, Defendants fail to state a claim because their threadbare allegations do not plausibly allege that the Guardian's claims lack a substantial basis in law and fact and that she brought them for the sole purpose of maliciously inhibiting their speech. For all these reasons, Defendants' Counterclaims should be dismissed.

## I. DEFENDANTS' COUNTERCLAIMS MUST BE DISMISSED BECAUSE THEY DID NOT OBTAIN PERMISSION TO SUE THE GUARDIAN.

Defendants' Counterclaims must be dismissed because Defendants failed to obtain the required court approval before asserting claims against the Guardian. Under New York law, once a guardian has been appointed for an incapacitated individual, no party may proceed against that guardian—acting in their representative capacity—without first securing permission from the appointing court. *See Terry*, 654 F. App'x at 6 (holding that claims "were properly dismissed because [plaintiff] did not obtain permission to sue [the court-appointed guardian]").

Here, the court-appointed Guardian, Ms. Morrissey, was authorized by the Guardianship Court on February 14, 2022, to "prosecute and defend civil proceedings" on behalf of W.W.H. (ECF 25-4). She commenced this action against Defendants in that capacity and with the express approval of the Guardianship Court. Am. Compl. ¶ 197. New York courts have consistently held that litigation cannot proceed against a guardian without the appointing court's permission. *See, e.g.*, *Wright*, 94 A.D.3d at 875. "Once a guardian is appointed for an incapacitated person, litigation against the incapacitated person and against the guardian as representative of the incapacitated person *should not proceed without the permission* of the court which appointed the guardian." *Id.* (emphasis added); *see also Terry*, 654 F. App'x at 6 (affirming dismissal of claims brought without permission from the guardianship court).

The permission-to-sue requirement is no mere technicality; it flows from the fundamental principle that the Guardianship Court holds plenary authority and responsibility for managing the

incapacitated person's property and affairs. *See In re Linden-Rath*, 729 N.Y.S.2d 265, 268 (N.Y. Sup. Ct. 2001) ("While title to property of an incapacitated person remains with the incapacitated person, the property of a ward is subject to the control of the court."). The purpose of the rule is to ensure that the Guardianship Court can discharge its oversight responsibilities efficiently and effectively, free from interference by unauthorized litigation. Court-appointed guardians act subject to the authority and oversight of the appointing court, and claims alleging wrongdoing by a guardian are thus barred unless and until the guardianship court consents to the suit. *See Tucker v. All Metro Home Care Services, Inc*, 2022 WL 17269441, at *2 (N.Y. Sup. Ct. Oct. 26, 2022) (dismissing claims against court-appointed guardian for acts taken "within the scope of the Court's order"). Requiring pre-suit approval avoids conflicting rulings, protects the incapacitated person's assets, and reinforces the appointing court's control over matters affecting the ward.

This pre-suit approval requirement mirrors the well-established *Barton* Doctrine, which mandates that a party seeking to initiate litigation against a court-appointed receiver must first obtain leave of the appointing court. The purpose is the same: to protect the appointing court's authority and the integrity of its oversight of the estate. *See McIntire v. China MediaExpress Holdings, Inc.*, 113 F. Supp. 3d 769, 773 (S.D.N.Y. 2015) (explaining that the *Barton* Doctrine guards the "overriding interest in the administration of the estate"). Here, Defendant's failure to secure leave to sue is a jurisdictional defect that requires dismissal under Rule 12(b)(1). *Cf. id.* at 774 (failure to comply with *Barton* Doctrine's leave requirement "bars exercise of subject matter jurisdiction over any third-party suit"); *In re Cumberbatch*, 657 B.R. 683, 703 (Bankr. E.D.N.Y. 2024) (dismissing for lack of subject matter jurisdiction where leave to sue was not obtained).

As relevant here, the requirement to obtain pre-suit permission applies to every action against a guardian, including counterclaims. *Epstein v. Perl*, 110 N.Y.S.3d 508 (N.Y. Sup. Ct. 2018) (dismissing counterclaims against a guardian for lack of pre-suit approval). The rule also

applies with equal force regardless of whether the incapacitated person or guardian initiated the underlying lawsuit. That is because the procedural protections are designed not for the Guardian's convenience but to safeguard the Guardianship Court's power to monitor and protect the ward, and thus cannot be waived by the Guardian. *See In re Linden-Rath*, 729 N.Y.S.2d at 267 (holding that the requirement "cannot be waived by the guardian or by action of another court," nor can the guardian's participation in other proceedings substitute for obtaining leave).

In *Terry*, as in this case, a court-appointed guardian was sued for allegedly bringing an improper lawsuit on behalf of an incapacitated person. *See Terry v. County of Suffolk*, No. 11 Civ. 2247 (E.D.N.Y. Feb. 17, 2012), ECF 60 at 4. The Second Circuit affirmed the district court's dismissal of the claims because no permission had been sought or obtained from the guardianship court. *Terry*, 654 F. App'x at 6. Consistent with *Terry*, district courts in this Circuit regularly enforce the pre-suit permission requirement. *See, e.g.*, *Friedman v. Friedman*, 2021 WL 3682270, at \*2 (S.D.N.Y. Aug. 19, 2021) (Karas, J.) (dismissing claims against a guardian for failure to obtain permission from the appointing court); *Galanova v. Portnoy*, 432 F. Supp. 3d 433, 442 n.8 (S.D.N.Y. 2020) (Koeltl, J.) (plaintiff "barred from bringing suit against" court-appointed guardian without court permission); *Gitzis v. Nozhnik*, 2020 WL 1989285, at \*3 (E.D.N.Y. Apr. 27, 2020) (dismissing claims against a guardian for lack of pre-suit approval).

Defendants have not alleged—nor can they—that they obtained the necessary leave from the Guardianship Court before asserting their Counterclaims. Their failure to do so is a fundamental jurisdictional defect that presently bars their claims from being heard by this Court.[4] Because

---

[4] While neither the Second Circuit nor district courts in this Circuit have explicitly stated whether claims dismissed for failure to seek leave from the guardianship court are properly dismissed under Rule 12(b)(1) or Rule 12(b)(6), the better argument is that Defendants' failure constitutes a jurisdictional defect under Rule 12(b)(1). This conclusion aligns with the reasoning applied in analogous cases under the *Barton* Doctrine, where courts have consistently held that the failure to obtain leave to sue deprives the court of subject matter jurisdiction. *See, e.g., McIntire*, 113 F. Supp. 3d at 774 (dismissing claims for lack of jurisdiction where leave was not obtained); *In re Cumberbatch*, 657 B.R. 683,

Defendants failed to seek this essential permission, the Court lacks subject matter jurisdiction over their Counterclaims and must dismiss them.

## II.    NEW YORK'S ANTI-SLAPP STATUTE DOES NOT APPLY IN FEDERAL COURT.

Defendants' counterclaims must be dismissed for the additional reason that New York's anti-SLAPP statute cannot be invoked in federal court because the "substantial basis" standard it imposes on a plaintiff's claims to avoid being liable for attorneys' fees—both at the pleading stage and through summary judgment—directly conflicts with the standard of scrutiny applied to claims prior to trial provided for by the Federal Rules of Civil Procedure.

New York courts have described the "substantial basis" standard as an "exact[ing]" threshold, similar in its operation to summary judgment. *See Reeves v. Associated Newspapers, Ltd.*, 232 A.D.3d 10, 24 & n.7 (1st Dep't 2024) (describing "substantial basis" as "more exacting than the liberal pleading standard"). By design, the "substantial basis" requirement discourages plaintiffs from filing complaints unless they can present a significant amount of evidence at the outset of the litigation, effectively preempting the discovery process. *See, e.g.*, *id.* at 18 (anti-SLAPP implementing rules "created a new evidentiary framework, which is, in effect, an accelerated summary judgment procedure"); *Adelson v. Harris*, 774 F.3d 803, 809-10 (2d Cir. 2014) (anti-SLAPP statutes weed out claims before discovery).

New York's legislature is of course free to impose a heightened standard of pre-trial scrutiny to certain types of claims in New York state courts. *See Walker v. Armco Steel Corp.*, 446 U.S. 740, 752-53 (1980) (recognizing states' authority over their own procedural rules). But federal courts apply Federal Rules of Civil Procedure 12 and 56 to evaluate a claim's pre-trial viability,

---

703 (Bankr. E.D.N.Y. 2024) (same). Like the *Barton* Doctrine, the requirement to seek leave from the guardianship court reflects the appointing court's exclusive authority over its appointed fiduciary, rendering any unauthorized litigation jurisdictionally barred.

14

and where a state law "answer[s] the same question" as those Federal Rules, the state law cannot be applied in federal court. *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 399 (2010). In federal court, a complaint need merely state a claim that is plausible on its face. *See Iqbal*, 556 U.S. at 678. Rule 8, which governs most pleadings, and Rule 12(b)(6), which addresses motions to dismiss, were carefully constructed to balance the need to prevent frivolous lawsuits with the right of plaintiffs to access the courts and develop their claims. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (describing the "liberal pleading requirements" of the Federal Rules); *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993) (rejecting heightened pleading standards beyond what the Federal Rules require). This permissive design ensures that potentially meritorious claims are not prematurely dismissed due to evidentiary gaps that can only be addressed through the discovery process.

New York's anti-SLAPP statute upends this carefully calibrated framework. By tying a plaintiff's liability for fee shifting to her ability to meet an exacting evidentiary threshold at the outset, New York law imposes a far more onerous level of scrutiny on a plaintiff than would be applied under the Federal Rules. This result clearly conflicts with the Federal Rules and imposes a chilling effect on plaintiffs who would otherwise have viable claims.

It is for this very reason that multiple judges in this District have rightly concluded that New York's anti-SLAPP statute conflicts (at minimum) with Federal Rules of Civil Procedure 12 and 56 because it "embed[s] a less plaintiff-friendly standard than Rule 12 (and Rule 56)," rendering it inapplicable in federal court. *Kesner v. Buhl*, 590 F. Supp. 3d 680, 701 (S.D.N.Y. 2022) (Engelmayer, J.) (holding N.Y. C.R.L. § 70-a inapplicable in federal court because its "substantial basis" standard "is distinct from—and more demanding than—the Rule 12(b)(6) standard"); *see also Nat'l Acad. of Television Arts & Scis., Inc. v. Multimedia Sys. Design, Inc.*, 551 F. Supp. 3d 408, 432 (S.D.N.Y. 2021) (Caproni, J.) ("New York's anti-SLAPP law imposes a different, and

higher, burden on the plaintiff at the pleading stage than the Federal Rules of Civil Procedure.");
*Carroll v. Trump*, 590 F. Supp. 3d 575, 582 (S.D.N.Y. 2022) (Kaplan, J.) (the anti-SLAPP statute's
"without a substantial basis" standard "conflicts with the standards under Federal Rules of Civil
Procedure 12 and 56"); *Ginx*, 720 F. Supp. 2d at 366 ("New York's legislature may have adopted
the Anti-SLAPP law to elevate a plaintiff's burden at the pleading stage above 'plausibility' . . . to
'substantial basis,' but the United States Congress has thus far declined to follow suit.").

These cases—along with the many others in this District and this Circuit that have held that
§ 70-a does not apply in federal court[5]—were rightly decided and align with the reasoning
articulated by the Second Circuit in *La Liberte*, 966 F.3d at 87. There, the Second Circuit held that
California's anti-SLAPP statute cannot be applied in federal court because (among other reasons)
it imposes a "probability of success" standard and liability for attorneys' fees on claims at the
pre-trial stage that is inconsistent with the Federal Rules of Civil Procedure. *Id.* ("The statute thus
'establishes the circumstances under which a court must dismiss a plaintiff's claim before trial,' a
question that is already answered (differently) by Federal Rules 12 and 56."). In reaching this
conclusion, the Second Circuit explained that the California anti-SLAPP statute was "quite
different" from otherwise permissible state-law fees-shifting provisions because the California
anti-SLAPP statute requires reliance on a "reasonable probability of success" procedural standard

---

[5] *See LoanStreet, Inc. v. Troia,* 2023 WL 5836237, at *6 (S.D.N.Y. Sept. 8, 2023) (Buchwald, J.) (agreeing with the
"[m]ultiple courts in this district have concluded that "§ 70-a is inapplicable in federal court"); *Exec. Park Partners
LLC v. Benicci Inc.*, 2023 WL 3739093, at *7 (S.D.N.Y. May 31, 2023) (Halpern, J.) ("Courts in this district have held
that § 70-a is inapplicable in federal court."); *CDC Newburgh Inc. v. STM Bags, LLC*, 692 F. Supp. 3d 205, 223
(S.D.N.Y. 2023) (Román, J.) ("New York's anti-SLAPP law does not apply in federal court."); *Prince v. Intercept*,
634 F. Supp. 3d 114, 142 (S.D.N.Y. 2022) (Preska, J.) (same); *Maron v. Legal Aid Soc'y*, 605 F. Supp. 3d 547, 567
(S.D.N.Y. 2022) (Failla, J.) (same); *Brady v. NYP Holdings, Inc.*, 2022 WL 992631, at *11 (S.D.N.Y. Mar. 31, 2022)
(Liman, J.) (same); *see also LaNasa v. Stiene*, 731 F. Supp. 3d 403, 417 (E.D.N.Y. Apr. 17, 2024) (Matsumoto, J.)
("[A] federal court also cannot grant costs or fees under New York's anti-SLAPP law."); *Friedman v. Bloomberg, L.P.*,
2022 WL 1004578, at *1 (D. Conn. Apr. 4, 2022) (Thompson, J.) ("The defendants' amendment would be futile
because New York's anti-SLAPP statute conflicts with the Federal Rules of Civil Procedure.").

that conflicts with the Federal Rules. *Id.* at 86 n.3 (citing *Adelson v. Harris*, 973 F. Supp. 2d 467, 493 n. 21 (S.D.N.Y. 2013)).

New York's anti-SLAPP statute suffers from the same flaw. Like California's law, New York's "substantial basis" standard imposes, in practice, a higher level of scrutiny to a plaintiff's claims at the outset of litigation that does not align with Rule 12(b)(6). Under *La Liberte*'s reasoning, New York's "substantial basis" standard cannot be applied in federal court. *See Carroll*, 590 F. Supp. 3d at 583 ("The Second Circuit's recent decision in *La Liberte v. Reid* requires the conclusion that the defendant cannot here invoke any of the relevant New York anti-SLAPP law's provisions."); *Nat'l Acad. of Television Arts & Scis.*, 551 F. Supp. 3d at 431 ("Applying the Second Circuit's reasoning in [*La Liberte v.*] *Reid*, the Court concludes that the 'substantial basis' standard articulated in New York's anti-SLAPP law similarly conflicts with the standards under Federal Rules of Civil Procedure 12 and 56.").[6]

In seeking to maintain § 70-a's right to attorneys' fees despite the statute's clear conflict with the Federal Rules, proponents for applying § 70-a in federal court often argue, as Defendants do here, that the "substantial basis" standard is "substantive," not procedural. *See* A&E CC ¶ 12 ("This cause of action for damages provided for in the Anti-SLAPP law is not a procedural mechanism" but a "*substantive* right under New York law"); eOne CC ¶ 12 (same); Creature CC ¶ 12 (same); *see also Bobulinski v. Tarlov*, 2024 WL 4893277, at *11-16 (S.D.N.Y. Nov. 26, 2024) (Oetken, J.) (concluding that § 70-a's "substantial basis" test for fee shifting "is doing no procedural work" and thus does not conflict with the Federal Rules); *Max v. Lissner*, 2023 WL

---

[6] Under the same reasoning, the provisions of New York's anti-SLAPP statute that authorize compensatory and punitive damages cannot be applied in federal court because they conflict with Federal Rule of Civil Procedure 11. *Cf. Brady*, 2022 WL 992631, at *11 (holding that "Rule 11 addresses sanctions for filings in federal court," and therefore, "Rule 11—and not the anti-SLAPP provision—would govern"). Rule 11 comprehensively governs the imposition of sanctions in federal court, addressing both the standard for imposing penalties and the procedures for doing so. Because New York's anti-SLAPP statute seeks to impose penalties under a separate standard, *see* N.Y. C.R.L. § 70-b-c, it answers the same question already resolved by Rule 11, creating an irreconcilable conflict.

2346365 (S.D.N.Y. June 6, 2023) (Caproni, J.) (dismissing claim brought under § 70-a for failure to state a claim under Rule 12). The question, however, is not whether § 70-a is "substantive" or "procedural"—the question is whether § 70-a conflicts with an applicable federal rule. *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010) (maj. op.) ("We do not wade into *Erie's* murky waters unless the federal rule is inapplicable."). Regardless of whether fee-shifting is a substantive right, if it is available only after applying a state-law test that conflicts with the Federal Rules, it is unavailable in federal court. As Judge Engelmayer explained in *Kesner*, § 70-a by its own terms only authorizes fee-shifting where an action "was commenced or continued without a substantial basis," N.Y. C.R.L. § 70-a(1)(a), and therefore "granting relief under § 70-a would require the Court to apply a state procedural standard that conflicts with the Federal Rules of Civil Procedure." 590 F. Supp. 3d at 701.

The few courts that have reached a contrary conclusion failed to fully grapple with the fundamental conflict that is created by applying § 70-a's "substantial basis" test in federal court to determine a party's entitlement to fee shifting. In *Max v. Lissner*, the court briefly noted that a claim for attorneys' fees under § 70-a can proceed in federal court before it went on to hold that plaintiff's complaint woefully failed to plead which allegations in defendants' state court defamation suit were not false, thereby avoiding the need to engage with the implications of applying the "substantial basis" test or the Second Circuit's decision in *La Liberte*. 2023 WL 2346365, at *9.

In *Bobulinski*, the court considered the application of § 70-a after already dismissing plaintiff's case for failure to state a claim under Rule 12(b)(6), which meant the defendants "automatically met" the § 70-a "standard for fees." 2024 WL 4893277, at *13. That posture is, of course, entirely different from this case, where Defendants did not even bring a motion to dismiss for failure to state a claim, much less succeed on one. The *Bobulinski* court concluded that § 70-a can be invoked in federal court because the "substantial basis" standard was "doing no procedural

work" after the claims were already dismissed. 2024 WL 4893277, at *13. But the test for a conflict is not whether federal and state standards lead to the same result in a particular case, but rather whether the applicable Federal Rules are "sufficiently broad to control the issue." *Carbone v. Cable News Network*, 910 F.3d 1345, 1355 (11th Cir. 2018).

The *Bobulinski* court distinguished *La Liberte* on the basis that California's "reasonable probability" test can only be invoked through a special California procedure. 2024 WL 4893277 at *13. This fails to recognize that even though a special procedure may not be required to invoke New York's anti-SLAPP law (although the statue does specifically cite only the procedures provided in New York CPLR §§ 3211(g) and 3212(h)), applying the law's substantial basis standard nonetheless conflicts with the Federal Rules because it alters the level of scrutiny to which a plaintiff's claim is subjected prior to trial. This makes both California's and New York's anti-SLAPP fee-shifting provisions different from Nevada's, which was presumed to be applicable in federal court in *Adelson v. Harris* precisely because it "does not establish a 'reasonable probability of success' standard that must be met without discovery, like the California Anti-SLAPP law." *La Liberte*, 966 F.3d at 87 n.3 (citing *Adelson*, 973 F. Supp. 2d at 493 n.21). It was on this basis that the Second Circuit concluded that Nevada's anti-SLAPP statute "does not squarely conflict with a valid federal rule." *Adelson*, 774 F.3d at 809. New York's law—which imposes a "substantial basis" test as early as commencement of a suit—subjects a plaintiff's claim to a state law standard, rather than the standard the Federal Rules impose, and thus cannot be applied in federal court.

The incongruous results that would follow from *Bobulinski*'s and *Lissner*'s reasoning is underscored here, where plaintiff has not asserted any claim for defamation but instead claims for declaratory judgment, unjust enrichment, Lanham Act violations, and fraud. Am. Compl. ¶¶ 219-67. If § 70-a applies in federal court, a plaintiff pleading unjust enrichment under

New York law on facts bearing some arguable connection to public participation would be treated differently (*i.e.*, potentially penalized with a fee award based on the level of pre-discovery support for the pleading's allegations at commencement) than if the same unjust enrichment claim were brought in federal court under the laws of the 16 states that lack an anti-SLAPP statute. Such a result would be entirely inconsistent with the purpose of the Federal Rules, which were designed to streamline procedure and ensure equal treatment of cases in federal court, regardless of state-specific procedural peculiarities. While states are free to define the elements of a claim and the defenses available, they cannot backdoor re-engineer the federal procedural rules to require that plaintiffs meet a higher burden prior to trial or face a penalty. That question—the level of scrutiny a plaintiff's claim faces in federal court before trial—"is already answered (differently) by Federal Rules 12 and 56." *La Liberte*, 966 F.3d at 87; *see also Carroll*, 590 F. Supp. 3d at 584-85. Because New York's anti-SLAPP statute creates a conflict with the Federal Rules of Civil Procedure, it cannot be invoked in federal court, and Defendants' Counterclaims must be dismissed.

## III.    DEFENDANTS FAIL TO STATE A CLAIM UNDER N.Y. C.R.L. § 70-A.

Even if § 70-a could be invoked in federal court (which it cannot), Defendants' counterclaims would still fail because they do not adequately allege that the Guardian's claims were commenced without a "substantial basis" in law and fact.

### A.    N.Y. C.R.L. § 70-a Does Not Apply to the Guardian's Lanham Act, Declaratory Judgment, and Fraud Claims.

As an initial matter, New York's anti-SLAPP statute does not reach three of the Guardian's four claims. *First*, the Guardian's Lanham Act claim is not subject to the state anti-SLAPP statute for the simple reason that state anti-SLAPP statutes do not apply to federal claims. *See Ginx*, 720 F. Supp. 2d at 366 ("[F]ederal courts have declined to apply anti-SLAPP statutes to federal claims."). That is "because such application would frustrate substantive federal rights," a result that

is clearly prohibited under the Supremacy Clause. *Bull. Displays, LLC v. Regency Outdoor Advert., Inc.*, 448 F. Supp. 2d 1172, 1180 (C.D. Cal. 2006) (state anti-SLAPP statute "does not apply to federal question claims in federal court"); *see also Douglas v. N.Y. State Adirondack Park Agency*, 895 F. Supp. 2d 321, 361 (N.D.N.Y. 2012), *on reconsideration in part*, 2012 WL 5364344 (N.D.N.Y. Oct. 30, 2012) (anti-SLAPP statute does not apply to federal claims).

*Second*, the Guardian's declaratory judgment and fraud claims are not covered by the anti-SLAPP statute because they do not arise from an "action involving public petition and participation." N.Y. C.R.L. § 70-a(1)(a). "[N]ot every suit that involves a motion picture or documentary is a SLAPP suit." *Abzug*, 2024 WL 4604789, at *3. To fall under the statute, a cause of action must be "based upon" a public communication or other lawful conduct in furtherance of free speech on an issue of public interest. N.Y. C.L.R. § 76-a(1)-(2). The "protected activity must constitute the means by which the" allegedly wrongful conduct occurred. *Abzug*, 2024 WL 4604789, at *6 (cleaned up) (quoting *Trump v. Trump*, 227 A.D.3d 635, 636 (1st Dep't 2024)).

Here, the declaratory judgment claim seeks a declaration that the Talent Agreement is void because W.W.H. lacked capacity at the time of its alleged execution in January 2023. Am. Compl. ¶ 235. This claim centers on the non-public negotiation and execution of a private contract regarding W.W.H.'s services, not on any public communication. *See Blatt v. Manhattan Med. Grp.*, 131 A.D.2d 48, 51-52 (1st Dep't 1987). Similarly, the fraud claim rests on nonpublic communications—fraudulent representations made by Defendant eOne's agents to W.W.H.'s representatives in March 2023. Am. Compl. ¶¶ 159-162; *see Abzug*, 2024 WL 4604789, at *6 (anti-SLAPP statute did not apply to "allegedly fraudulent, tortious, or otherwise impermissible actions" tied to a documentary's production). These events occurred about a year before the Program's broadcast and are not "based upon" that broadcast. *See Blatt*, 131 A.D.2d at 51-52 (question of incapacity determined with reference to time of transaction); *Ramiro Aviles v. S & P*

*Glob., Inc.*, 380 F. Supp. 3d 221, 276 n.23 (S.D.N.Y. 2019) (fraud claim accrues "at the time the defendant makes a knowingly false statement of fact with the intent to induce reliance" and the plaintiff justifiably relies on that statement).[7] Because both the declaratory judgment and the fraud claim center on private, non-public conduct, neither is covered by the anti-SLAPP statute.

**B.      The Guardian's Claims Have a Substantial Basis in Law and Fact.**

Even assuming § 70-a applies, Defendants fail to plausibly allege that the Guardian's claims lack a substantial basis in fact and law. Rather than alleging facts supporting their disagreement with the Guardian's Amended Complaint, Defendants spend most of their Counterclaims discussing the Anti-SLAPP statute's history and this litigation's procedural posture. A&E CC ¶¶ 3-13, 32-36; eOne CC ¶¶ 3-13, 40-44; Creature CC ¶¶ 3-13, 43-47. When it comes to factual allegations that would support a claim that this suit was brought without a "substantial basis in law and fact," Defendants' allegations are shockingly sparse. Defendants rely almost entirely on their assertion that the Talent Agreement is valid and thus "bars each" of the Guardian's claims. A&E ¶¶ 7, 38-41; eOne ¶¶ 7, 46-49; Creature ¶¶ 7, 49-52. This argument falls apart under scrutiny.

*First*, Defendants fail to plausibly allege that W.W.H. had capacity to sign the agreement in January 2023, much less that the Guardian's allegations to the contrary lack a substantial basis. They do not dispute that they learned that W.W.H. suffers from dementia during filming—her condition is even discussed, albeit in passing, in the Program that Defendants produced. *See* A&E Ans. ¶ 42; eOne Ans. ¶ 42; Creature Ans. ¶ 42. Nor do they dispute extensive public reporting on

---

[7]     Reserving all rights, the Guardian acknowledges that because Defendants were enriched specifically by the Program's publication, the unjust enrichment claim—despite being unrelated to the content of the Defendants' speech—may arguably fall within the scope of the anti-SLAPP statute as a claim "based upon . . . any communication in a place open to the public . . . in connection with an issue of public interest." *But see Concerned Citizens of Forest Hills Inc. v. W. Side Tennis Club*, 215 N.Y.S.3d 762 (N.Y. Sup. Ct. 2024) (nuisance claim "based on the volume and bass levels emanating from the Stadium, not the content of the noise emitted" not subject to anti-SLAPP statute). In any event, Defendants' Counterclaims arising from the unjust enrichment claim must be dismissed for multiple other, independent reasons, as explained herein.

W.W.H.'s mental challenges that raised serious questions about her mental capacities long before Defendants began filming in August 2022 or purportedly obtained her signature in January 2023. Indeed, Defendants concede that before the Talent Agreement was purportedly signed, it had been publicized that W.W.H. was subject to an Article 81 guardianship, that a temporary guardian had been appointed to manage her affairs, and that her long-running television show had been canceled due to concerns about her mental capacity. *See* A&E Ans. ¶ 16, CC ¶ 2; eOne Ans. ¶ 16, CC ¶ 2; Creature Ans. ¶ 16, CC ¶ 2; *see, e.g.*, Creature Ans, ¶ 22 (citing Lacey Rose, *Inside the Final Days of* The Wendy Williams Show, Hollywood Reporter (Aug. 17, 2022)).

In contrast, Defendants' threadbare assertion that W.W.H. "was not legally incapacitated" at the time she purportedly executed the contract and that "upon information and belief, she did sign it," A&E CC ¶ 38; eOne CC ¶ 46; Creature CC ¶ 49, is unsupported by factual allegations. *See Lissner*, 2023 WL 2346365, at *10 (dismissing anti-SLAPP claim lacking sufficient "factual allegations"). They offer no factual allegations to counter the Guardian's extensive allegations showing W.W.H.'s incapacity and indeed admit that much of it is true. Lacking any factual allegation to support their conclusory claims, Defendants cannot plausibly maintain that the Guardian's allegations lack a substantial basis in fact or law.

Defendants also cite the Guardian's supposed failure to rescind and alleged approval of W.W.H.'s participation. A&E CC ¶ 39; eOne CC ¶ 47; Creature CC ¶ 50. Yet Defendant eOne admits that W.W.H.'s court-appointed lawyer notified Defendants on March 14, 2023 that W.W.H. "was not at the time in a position to sign" the contract and that Ms. Jones of eOne acknowledged the need for a revised Talent Agreement because the original was invalid. eOne Ans. ¶ 159. Defendants otherwise ignore the Guardian's further allegations of misrepresentations regarding the Program's intent and their own acknowledgment that they were told the original Talent Agreement

was legally invalid, Am. Compl. ¶¶ 159-162, leaving their counterclaims devoid of the factual support necessary to cast any real doubt on the substantial basis underlying the Guardian's claims.

Finally, Defendants' conclusory contention that the First Amendment bars the Guardian's Lanham Act claim is incorrect. A&E CC ¶ 50; eOne CC ¶ 58; Creature CC ¶ 61. As established above, New York's anti-SLAPP statute does not apply to the federal Lanham Act claim. *See supra* § III.A. Even if it did, the First Amendment does not shield Defendants' false statements that W.W.H. "executive produced" and endorsed the Program.

Under the *Rogers* test, courts balance the public interest in free expression against the need to prevent consumer confusion. *Cliffs Notes, Inc. v. Bantam Doubleday Dell Pub. Grp.*, 886 F.2d 490, 494 (2d Cir. 1989). The test first asks "whether the use of the trademark"—here, W.W.H.'s purported endorsement—"has any artistic relevance" to the underlying work, and, if so, then considers "whether the use 'explicitly misleads as to the source or content of the work.'" *AM Gen. LLC v. Activision Blizzard, Inc.*, 450 F. Supp. 3d 467, 477-78 (S.D.N.Y. 2020) (quoting *Rogers v. Grimaldi*, 875 F.2d 994, 999 (2d Cir. 1989)). Even assuming Defendants' endorsement statements possessed some artistic relevance (which they do not), they were unquestionably misleading and demonstrably false, as Plaintiff adequately alleges. Defendants admit that the producers never showed W.W.H. the Program or its trailer before airing, A&E CC ¶ 30; Creature CC ¶ 41, making it impossible for her to approve, endorse, or executive produce it. Am. Compl. ¶ 249.

Given the Guardian's allegations and Defendants' own admissions, Defendants cannot credibly assert that the Guardian's false endorsement claim lacks a substantial basis in fact or law. And because Defendants' misrepresentations regarding W.W.H.'s involvement are false, neither the First Amendment nor the anti-SLAPP statute protects them from liability, and they have failed to allege any factual or legal grounds undermining the Guardian's Lanham Act claim.

### C.    Defendants Do Not Plead Entitlement to Compensatory and Punitive Damages.

Defendants demand not only fee-shifting, but also shamelessly seek additional compensatory and punitive damages, both of which require an additional showing above and beyond what is required under statute's fee-shifting provision. Compensatory damages under N.Y. C.L.R. § 70-a(1)(b) demand an "additional demonstration" that the Guardian brought suit "for the purpose of harassing, intimidating, punishing, or otherwise maliciously inhibiting" speech. Punitive damages require a still higher showing, requiring a demonstration that the Guardian acted "for the sole purpose" of harassing or punishing speech. N.Y. C.L.R. § 70-a(1)(c).

Defendants fail to plausibly allege any factual support that would meet these heightened standards. All that they can muster are speculative, conclusory assertions about the Guardian's mental state and motives. *See, e.g.*, A&E CC ¶ 14 ("It was only when Morrissey realized that the Documentary would question the quality of her own guardianship of W.W.H. that Morrissey suddenly decided to try to ensure the Documentary would never be released."). But Defendants do not allege any facts—nothing that the Guardian said or did, or any facts from which the Court could infer her motivations—that would support their baseless accusations. *See Oliva v. Town of Greece*, 630 F. App'x 43, 44 (2d Cir. 2015) ("Ultimately, the inquiry in a motion to dismiss is a 'context-specific' examination of whether a plaintiff has alleged a 'plausible,' and not just a possible, claim for relief."); *Gallop v. Cheney*, 642 F.3d 364, 368 (2d Cir. 2011) ("[T]he courts have no obligation to entertain pure speculation and conjecture"). Without any factual underpinning, Defendants cannot satisfy the "additional demonstration" needed to justify either compensatory or punitive damages, and their claims for such damages must therefore be dismissed.

### CONCLUSION

For the foregoing reasons, the Court should grant the Guardian's motion and dismiss Defendants' Counterclaims.

Dated: December 20, 2024
       New York, New York

Respectfully submitted,

 /s/ Roberta A. Kaplan
Roberta A. Kaplan
Timothy S. Martin
Christopher R. Le Coney
Tasha N. Thompson
Maximilian T. Crema
KAPLAN MARTIN LLP
1133 Avenue of the Americas, Suite 1500
New York, New York 10036
Tel.: (212) 316-9500
rkaplan@kaplanmartin.com
tmartin@kaplanmartin.com
cleconey@kaplanmartin.com
tthompson@kaplanmartin.com
mcrema@kaplanmartin.com

Ellen V. Holloman
Amanda L. Devereux
CADWALADER, WICKERSHAM & TAFT LLP
200 Liberty Street
New York, New York 10281
Tel.: (212) 504-6000
ellen.holloman@cwt.com
amanda.devereux@cwt.com

*Counsel for Plaintiff Sabrina E. Morrissey,
acting in her capacity as Guardian of
W.W.H.*